[Civ. No. 1185.    Third Appellate District.—April 2, 1914.]

JOHN F. HALL, Appellant, v. E. W. WELLS & SON (a Copartnership), Respondents.

PROMISSORY NOTE—FRAUD IN INCEPTION—BURDEN OF PROOF ON INDORSEE.—Upon proof of fraud in the inception of a promissory note the burden is cast upon an indorsee to show that he is an innocent holder, which he may do by showing that he purchased the note before maturity or from an innocent indorser for value in the usual course of business.

ID.—INDORSEE OF OVERDUE PAPER—NOTICE OF INFIRMITY.—An indorsee of overdue paper takes it with notice that it is subject to some defense, such as fraud, illegality, duress, want of consideration, or some other infirmity arising out of the transaction in which the paper was given.

ID.—INSTALLMENT NOTE—INDORSEMENT AFTER ONE INSTALLMENT DUE. An indorsee of an installment note after one installment is due and unpaid is charged with notice of the dishonor of the entire note and of the maker's equities; the infirmity affects every installment alike.

ID.—FRAUD AND WANT OF AUTHORITY IN EXECUTION OF NOTE—SUFFICIENCY OF EVIDENCE TO SHOW.—In this action on a promissory note by an indorsee after maturity, the evidence is sufficient to show that the execution of the note was without the authority of the maker and was induced by the fraud of the payee's agent, and the evidence is not sufficient to show a ratification of the unauthorized execution of the paper.

ID.—AGENT'S UNAUTHORIZED ACTS—RATIFICATION BY PRINCIPAL—FULL KNOWLEDGE OF FACTS.—A ratification of the unauthorized act of an agent in executing a promissory note can operate only after full knowledge of the facts.

APPEAL from a judgment of the Superior Court of Humboldt County and from an order refusing a new trial. Clifton H: Connick, Judge.

The facts are stated in the opinion of the court.

Ernest Walling, for Appellant.

Mahan & Mahan, for Respondents.

CHIPMAN, P. J.—This is an action on a promissory note of which the following is a copy:

"P. O. Eureka, State of Calif., Aug. 3, 1911.   For value received we promise to pay to the order of American Manufacturing Company, fifteen hundred dollars ($1,500) at Chicago, Ill., in installments payable as follows: One month after date $150.00; (then follow nine other installments of $150.00 each, payable in 2, 3, 4, 5, 6, 7, 8, 9, and 10 months after date respectively.)   Default in the payment of any installment shall at the option of the payee herein, render the unpaid balance immediately due and payable.

"(Signed)    E. W. WELLS & SON,

"Per E. P. Correll."

It is alleged in the complaint that "defendant by its agent, duly authorized thereto, made and signed" said promissory note; that, prior to the commencement of the suit and before the maturity of said note, the payee, for a valuable consideration, sold, assigned, and transferred said note to the Commercial Security Company, a corporation duly incorporated under the laws of the state of Illinois; that, prior to the commencement of the suit, said last named company, for a valuable consideration, sold, assigned, and transferred said promissory note to plaintiff, who ever since has been and now is the owner and holder thereof.

In its answer defendant denies the execution of said promissory note; denies that by its duly authorized agent or any agent of defendant it executed the same; denies the alleged transfers of said promissory note and the payment of a valuable or any consideration therefor.   It is further alleged, on information and belief, that said E. P. Correll (who executed said note) "signed the name of E. W. Wells & Son to a certain contract of which the following is a copy": Then follows a somewhat lengthy and complicated document which is an order for "1 Touring car, described on reverse side; 16–42 piece dinner sets" and sundry articles apparently to be used in conducting some sort of a contest by which the manufacturing company was to bring about an increase of defendants' sales of merchandise from forty-five thousand dollars per annum to sixty-five thousand dollars; for the property ordered and other considerations the defendant was to pay one thousand five hundred dollars.   The promissory note in question

was appended to the contract and was part of it but was detachable without interfering with other parts of the contract. It is alleged that Correll was induced to sign said contract through the false and fraudulent representations of the payee's agent, one W. W. Gray, the particulars of which are set out, that said company failed to keep and perform the covenants by it agreed to be performed, in certain respects, which are set out.

The cause was tried by the court without a jury. Findings of fact were waived and defendant had judgment. Plaintiff appeals from the judgment and order denying his motion for a new trial.

The American Manufacturing Company is a Tennessee corporation and, we infer, has its place of business in Lexington, Tenn., and has a sales' house in Chicago. The Commercial Security Company is an Illinois corporation doing business in Chicago. Plaintiff is an attorney residing in Lexington, Tennessee. The testimony submitted by plaintiff consists of his deposition and the depositions of the officers of the two corporations.

The secretary of the manufacturing company testified that the contract or "order for one of its automobile advertising deals" was procured by its agent, W. W. Gray; that "E. W. Wells & Son never claimed at any time or in any way that they did not execute the order or note referred to in the order, or that they did not authorize any one to execute the same for them. The order was received by the American Manufacturing Company on August 8, 1911."

One of the claims made by plaintiff is that, even conceding Correll's lack of authority, defendant ratified the act of signing its name to the contract and note. This contention rests largely on the correspondence between the parties and hence it becomes necessary to set it out. Witness testified: "On August 21st, 1911, the American Mfg. Co. received the following telegram from E. W. Wells & Son:

" 'Eureka, California, Aug. 21, 1911.

" 'AMERICAN MFG. Co.,

" '150 So. Lasalle St., Chicago.

" 'Do not ship automobile till you receive our letter. Conditions of your contract not entirely satisfactory.

" 'E. W. WELLS & SON.'

"The letter referred to by the telegram and received by the American Mfg. Co., is as follows:

"'Eureka, California, Aug. 22, 1911.

"'American Manfg. Co.

"'Gentlemen: Confirming our telegram of yesterday we wish to state that your Mr. Gray first called upon the writer (our Willard Wells) and outlined in a general way your proposition; having made all arrangements to take my vacation at this time, could not go into details as I should have done, but turned the matter over to our head clerk, Mr. E. P. Correll. Now the most serious objections we have to this contract, is that about 35 per cent of our entire business is kodak goods. Our contract with the Eastman Kodak Company will not permit us to enter this proposition of yours as you call for each cent purchased at our stores, so you will see that if we eliminate this part of our business your contract cannot be fulfilled.

"'Now we do not want to ask too much, but is there not some way that will be agreeable to you to cancel same? If necessary we think we can transfer the contract to another line of business.

"'Please advise us at once.

"'Yours very truly,
"'E. W. WELLS & SON.'

"Telegram marked 'D' exhibit 'D' and letter Exhibit 'E.'

"In reply to this letter, Exhibit 'E,' the American Mfg. Co. wrote the defendant as follows:

"'Sep. 6, 1911.

"'W. W. WELLS & SON,
"'Eureka, Cal.

"'Dear Sirs: Replying to your letter of recent date in reference to order given our representative for automobile to be used in a voting contest, for which you signed note and contract, wish to state that it is difficult for us to cancel an order of this kind, as we immediately passed on your order and ordered the printing matter, and got the machine ready for shipment. We are also obliged to pay the commission to our salesman for taking the order and it would be quite an expense to you if the contest did not go through. In regard to the kodak part of the business will say that if you desire,

24 Cal. App.—16

you need not count them in the sales, that is not give out any votes for kodaks sold and we will make you the same percentage of increase eliminating the sales of Eastman's goods. Our customers are all having marked success with the contest, many of them doubling their sales, and we are sure you would be much pleased and benefited by it. We enclose you two letters showing what success others have had. Awaiting your immediate reply, we are very truly yours,

" 'AMERICAN MANUFACTURING COMPANY.' "

The manufacturing company again wrote defendant, on September 29, 1911, calling for certain information and stating "your automobile has been ordered shipped to you and your printed matter will come forward in a few days." In reply, defendant wrote, on October 6: "Your letter dated September 29, 1911, received. We are unable as we have stated before to accept this proposition. See our letter dated August 22, 1911."

Witness testified that, on October 4, 1911, the company wrote defendant "offering to cancel the order if the defendant would pay what the company was out on the transaction, to wit: the salesman's commission of $185, the amount paid for discounting the defendant's note, $100, and printed matter $50." There is no copy of this letter in the record. Whether it was received by the defendant does not appear.

Witness Hall testified: "Defendant never offered to accept these terms of settlement"; that "the American Manufacturing Company complied with all the terms of their contract with defendant on their part. The American Manufacturing Company was not the owner and holder of the defendant's note at the time the last letter was written. They had previously discounted it with the Commercial Security Company of Chicago." Witness further testified that the manufacturing company secured one thousand three hundred and eighty dollars as consideration for the transfer of said note; that the company "had nothing to do with placing the note in the hands of the plaintiff for collection and have had no control over said note since they sold it."

Witness Crandall, president of the security company, testified that his company purchased the note in question on September 29, 1911, and paid one thousand three hundred and eighty dollars for it, and about the middle of August, 1912,

transferred it to plaintiff; that, to witness's knowledge, his company "was never informed, either before or after they had purchased said note, as to what the consideration was for it between the original parties to it."

Plaintiff, Hall, testified: "Said note was due when it was delivered to me in August, 1912, and I do not claim to be a holder of said note in due course before maturity and for value. The rights I claim under said note are those of a purchaser for value after maturity, and I only claim such rights as the Commercial Security Company had therein. I first saw the note sometime during the month of January, 1912, when it was placed in my hands for collection by said Commercial Security Company, and about that time I sent the note to C. P. Cutten, an attorney of Eureka, Cal., for collection. He returned the note to me and I afterward sent it to Mr. Ernest Walling of Eureka, Cal., for collection. I did not know what the consideration was that passed between the parties for the making of this note, when the same was delivered to me in January, 1912. I first learned what the consideration was for the making of said note after January 15, 1912. I purchased the note because I was assured by the Commercial Security Company, then my clients, that they were the holders of said note in due course of trade, before maturity, of all installments but the first of $150, due September 3, 1911, and upon which no demand had been made, for a cash consideration, and thereupon I purchased the note, as they said they would rather sell than litigate."

It appeared that Willard Wells and his father, E. W. Wells, constituted the defendant partnership. The members were also interested in the Red Cross Pharmacy, doing business in Eureka, of which E. P. Correll was a member and the manager. The two firms were entirely separate and distinct from each other. Correll had nothing to do with the defendant and had no authority to act for it in any capacity. Willard Wells managed the defendant partnership, his father living in San Francisco. On August 2, 1911, Gray, the agent of the manufacturing company, called on Willard Wells and explained the automobile contest scheme being promoted by the manufacturing company. Wells seemed to think favorably of it, but objected that it involved too much for his firm alone and suggested that the two firms in which he was interested

might take it up and told him to see Correll. He, shortly after, about noon, met Correll and told him of this scheme and that Gray would call upon him and explain. He testified: "My purpose in speaking to Mr. Correll was to make a joint matter of it between the two stores, provided anything was done. The next day I left for San Francisco. I was gone twelve days and then returned to Eureka. On my return I had a talk with Mr. Correll within a day or two, and asked him what he had done with the automobile contest, if he had gone into it, and he said 'I thought we had better take it up and I have entered into an agreement with him.' He had no copy of the agreement and I did not see any copy until the month of September, 1911, or October, 1911, possibly sixty days after the date of its signing. A copy of it was then sent through the mail to E. W. Wells & Son. Immediately after having the talk with Mr. Correll on my return, I wired the American Mfg. Co., and also wrote them. The telegram and letter have already been read in evidence. At the time I wrote the letters read in evidence and at the time I sent the telegram I did not have any copy of the contract. I was relying at that time in regard to the terms of the contract upon the information I had received from Mr. Gray." He testified that he did not know there was a note signed by Correll until the automobile arrived when the company was immediately notified by telegraph that it would not be received and "was held at their disposal." The bond which was to have been given by the company was sent to the Humboldt County Bank, in October, 1911, but neither defendant nor Correll had notice that it was there. Witness testified: "The American Mfg. Co. never furnished any 1912 Howard automobile under this contract as called for by it, The automobile that was sent was a 1909 "Crow" machine. I employed an expert to examine the machine sent and his report to us was that it was not according to the specifications in any sense of the word. It was a very inferior car to the one called for by the contract. I refused to accept the car, and the American Mfg. Co. were notified by my attorneys to that effect by wire, and also that the car was held at their disposal. I know from their letters that they received that telegram. I never authorized E. P. Correll at any time to sign the name of E. W. Wells & Son to this note, nor to any

instrument.   When I sent the first telegram I knew that Mr.
Correll had signed a contract because he told me so, but I
did not know anything about any note being signed.   I know
the gist of the contract and knew that it took in the sale of
kodaks.   I have no recollection of ever hearing that there was
a note signed until the automobile arrived and I put the
matter in the hands of my attorneys Mahan & Mahan.   The
telegram notifying the American Mfg. Co. that we would not
accept the automobile was sent November 29, 1911.   I re-
ceived a copy of the contract before that, sometime in Oc-
tober.''   On cross-examination he was asked to explain what
he meant by his letter of August 22, 1911, and answered:
''I wanted Mr. Correll to determine whether he wanted to take
it up or not, and whether he thought it was a good proposi-
tion as between the Red Cross Pharmacy and E. W. Wells
& Son's stores.   I intended if we handled the proposition
at all to handle it between the two stores.   At the time I
came back from the city and at the time I wrote the letters
introduced in evidence I did not know that Mr. Correll had
signed the contract 'E. W. Wells & Son' alone.   I had not
the slightest idea how he had signed it, whether he signed
it Red Cross Pharmacy or E. W. Wells & Son, although I
naturally supposed that he would sign it E. W. Wells & Son.
The first I knew it was signed E. W. Wells & Son was when
I received the copy of the contract.   Mr. Gray understood at
the time I was talking to him that I was to see Mr. Correll
and see what could be done between the two stores.   I did
not tell Mr. Gray that I would turn the matter over to Mr.
Correll to handle.   The matter was turned over to him be-
cause he made this contract.   I did not communicate to Mr.
Gray my intention of having Mr. Correll act for us in the
matter, but he went to see Mr. Correll because I told him to.
Q. Did you intend for Correll to act for you in the matter
if he saw fit to go into the proposition at all?   A. In one
sense of the word I did; I told Correll if he thought it was a
good proposition that we would take it up.   Q. That was what
your intention was when you talked with Mr. Gray, too, wasn't
it?   A. In one sense of the word, yes.   In my conversation
with Mr. Correll after my return he told me he had taken
the matter up with Mr. Gray and signed the contract with
him. . . .   In turning the matter over to Mr. Correll my idea

was that unless he saw fit to take the matter up for the Red Cross Pharmacy the thing was ended. It was for him to say what he thought about it and then confer with me for further dealings; if it was agreeable for the Red Cross Pharmacy then I would consider it for E. W. Wells & Son; . . . that is what I had in mind when I wrote the letter marked Exhibit E, stating that I had turned the matter over to Mr. Correll.''

Witness Correll testified that, soon after he met Mr. Wells, Gray called on him and said that Wells had told him to call and have witness look into the automobile proposition. Later in the afternoon Gray returned and explained the scheme fully. Witness testified: ''I told him to go and see Willard Wells and get his final approval of the thing and then come back again and I could close the matter up. That was in the afternoon of August 2d. Willard Wells was in town then. Mr. Gray went away and came back the next day in the afternoon and he told me he saw Mr. Wells, and that he was very well satisfied with the whole proposition, and that he was willing to go in with his store, and that we could go in together on that proposition. That was on the 3d he told me this. Then I told Mr. Gray to go ahead and fix the matter up. He fixed the papers up and I looked at them, but to tell the truth I looked more at the automobile than anything else. I asked him all kinds of questions about the automobile and he gave me a full detailed account about what kind of a machine it was and what a good grade of machine it was. He said it was a 1912 Howard car, and the same kind of a car as is represented on the contract. After he got the paper made out he handed it to me and wanted me to sign it. I told him that I would sign the paper only with the understanding that it was satisfactory to Mr. Willard Wells. I was going to sign it Red Cross Pharmacy first, then I told him that we had no rating and I don't know whether to sign it E. W. Wells & Son or not. He said 'Yes, go ahead, sign it E. W. Wells & Son.' I told him then it must have the absolute approval of E. W. Wells & Son. I would only sign it on that condition. He said he saw Mr. Wells and it would take a month to fix everything up satisfactorily. At that time Willard Wells was gone. At the time I signed it, I did not know that I was signing a promissory note. I

did not know that until Willard Wells called my attention
to it, after one of the Mr. Mahans had called his attention
to it; that was after the machine arrived, about the 25th
of November.    I talked with Willard Wells after he returned,
I don't know whether I told him I had signed it or not, but
I did not tell him I had signed the name of E. W. Wells &
Son and I did not tell him I had signed a promissory note.
The first conversation I had with Mr. Wells about signing
the name of E. W. Wells & Son to it was when the contract
came back, about the 3d or 4th or 5th of October.    Willard
Wells in the first conversation I had with him never in any
way authorized me to sign the name of E. W. Wells & Son to
this paper.    I simply signed it that way because the Red Cross
Pharmacy had no rating and I never imagined I was signing
a serious paper of that kind, and I signed it on the condition
that it should have the approval of Willard Wells.''

He was asked, on cross-examination, why he signed the
name of E. W. Wells & Son to the note and not the names
of the two stores.    He answered: ''I didn't know it was a
note, I was going to sign Red Cross Pharmacy, and I told
him that we had no rating, and it was a kind of mutual agree-
ment that I should sign 'E. W. Wells & Son' and I only
signed that on condition that it would be absolutely satis-
factory to E. W. Wells & Son.    I did not know this was a
note.    I did not read it before I signed it because I was
very busy that day and did not have time to go into the
matter thoroughly, and in fact I never signed a paper like
this before in my life. . . . Mr. Gray came back a second
time and told me he had seen Mr. Wells and told him that I
was satisfied with it, and he told me that it was satisfactory
to Mr. Wells to take the matter up.    That was the day I
signed the contract.    The last time I talked with Mr. Gray,
Mr. Wells had gone away.''

Plaintiff testified that he did not claim to be the holder ''in
due course before maturity and for value,'' but solely under
''such rights as the Commercial Security Company had
therein'' and that he knew what the consideration of the
note was.    It was held by us, in *Meyer* v. *Lovdal,* 6 Cal. App.
369, [92 Pac. 322], that upon proof of fraud in the inception
of the note the burden is cast upon the indorsee to show that
he is an innocent holder, which he may do by showing that

he purchased the note before maturity or from an innocent indorser for value in the usual course of business. See, also, cases there cited.

The indorsee of overdue paper takes it with notice that it is subject to some defense, for he takes it at a time when in due course it should have been paid. He is, therefore, subject to the defense that it was affected in its inception with some inherent vice, as, for example, fraud, illegality, duress, want of consideration, payment, or some equitable defense arising out of the transaction in which the paper was given. (1 Daniel on Negotiable Instruments, sec. 725a.)

The evidence was that the security company purchased the note after the maturity of the first installment. This raises the question whether a purchaser or indorsee of a promissory note, payable in installments, after one installment is due and unpaid, must be charged with notice of the dishonor of the entire note and of the maker's equities; and does such an infirmity affect every installment alike?

Mr. Daniels, in his Negotiable Instruments, volume 1, section 787, says: "If the note be payable by installments it is dishonored when the first installment becomes overdue and unpaid, and he who takes it afterward takes it subject to all equities between the original parties." *Vinton* v. *King,* 4 Allen, 562; *Fued* v. *Tibbetts,* 57 Mo. 359; *Hart* v. *Stickney,* 41 Wis. 630, are cited and fully support the text. The reason for the rule is given in *Vinton* v. *King,* and seems to us entirely satisfactory. Said the court, by Mr. Justice Metcalf: "The note is a single contract to pay $212 in four half-yearly installments, and the plaintiff took it with notice on its face that, as to the first installment, the defendant might have a justifiable cause for withholding payment, whatever that cause might be; whether a cause which affected that installment only—as a release thereof by the payee, or a legal set-off against him to the amount thereof—or a cause which between him and the payee, vitiated the whole note, as want of failure of consideration, unlawful consideration, fraud or duress. And if the payee had sued for the recovery of the first installment, before the second was payable, the defendant might have defeated the action, by showing that the note was wholly void; and a judgment for him, on such ground of defense, would have been conclusive against the main-

tenance, by the payee, of a subsequent action to recover the
other installments.''

It remains to determine whether defendant supported its
defense by sufficient evidence.

There is, in our opinion, sufficient evidence to show that
the contract and note, purporting to have been executed by
defendant, was signed without its authority induced by the
false and fraudulent representation of the agent of the manu-
facturing company.   This is fully shown by the testimony of
witness Wells and witness Correll and is undisputed.   The
only question as to which there might be two different opin-
ions is—Was the court authorized to find from the evidence
that defendant did not ratify the act of Correll in signing its
name to the so-called order and promissory note?

We have given the evidence very fully and need not enter
upon an extended comment as to what inferences may justly
be drawn from it.   The payee of the note is answerable for
the acts of its duly authorized agent, Gray, among which
were his false representations that defendant had agreed to
enter into the contract and that Correll might sign for it;
that Gray prepared the papers and directed how they should
be signed; that he left no copy with Correll, in the absence
of which Willard Wells, who represented the defendant, had
no means of knowing what were the provisions of the con-
tract.   Correll testified that he did not know he was signing
a promissory note and Wells testified that he did not know
this fact until his attention was called to it by his attorneys
after he had written the letter of August 22, 1911.   No copy
of the contract was sent to defendant until some time in Oc-
tober.   This letter, of August 22, 1911, relied upon by plain-
tiff as a ratification of the contract, was written in ignorance
of its details and especially in ignorance that it had attached
to it a promissory note signed by defendant.   There was no
correspondence between the parties except this letter of Au-
gust 22 and the reply of September 6, until September 29,
when the manufacturing company wrote the letter herein-
above set out, to which defendant repeated its statement that
it would not accept the proposition, calling attention to its
letter of August 22.   It was on September 29, 1911, that the
note was assigned to the security company, but it did not

get into the hands of plaintiff as owner until about a year later, although he had it for collection in January, 1912.

Turning to the letter of August 22, we cannot see how it can by its terms be regarded as in any sense a ratification; it distinctly states that the contract is not satisfactory. When the telegram of the 21st of August and the letter of the 22d were sent, defendant had but an imperfect knowledge of the contract and none whatever as to how it was signed or that it embraced a promissory note signed by defendant. If Correll may be said to have been defendant's agent, which in fact he was not, he could not exceed his authority as such agent and a ratification of his unauthorized acts can only operate after full knowledge of those facts. (*Davidson* v. *Dallas,* 8 Cal. 227.) ''The essence of either an election or ratification is that it was done advisedly with full knowledge of the party's rights'' (*King* v. *Lagrange,* 50 Cal. 328) ; the party to be charged ''must have fully known what he was doing.'' (*Brown* v. *Rouse,* 104 Cal. 672, [38 Pac. 507].) We can discover no intention of defendant to ratify the contract relied upon, either in the correspondence or anything that took place between the parties. Some printed matter was sent defendant in October which it refused to receive. The automobile was not sent until in November, more than two months after defendant had written that the contract was not satisfactory, and it was not such a machine as was promised but an inferior one. The manufacturing company was promptly notified that it would not be accepted and that it was held subject to the shipper's order.

Plaintiff alleges in his complaint that ''the said defendant by its agent, duly authorized thereto, made and signed its promissory note of which the following is a copy.'' We do not think he has established this issue either by showing the direct authority of defendant given to its agent or by its subsequent ratification of the act of the alleged agent of defendant.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.