[Civ. No. 1622. Third Appellate District.—March 12, 1917.]

## PALO ALTO MUTUAL BUILDING AND LOAN ASSOCIATION (a Corporation), Respondent, v. FIRST NATIONAL BANK OF PALO ALTO (a Corporation), Appellant.

Building and Loan Association—Indorsement of Check by Secretary—Lack of Authority—Appropriation of Proceeds—Liability of Bank.—The secretary of a building and loan association has no authority by virtue of his office to indorse and cash a check payable to the association for his own benefit, and where he does so, and is without express authority, the bank cashing the check is liable to the association for the amount thereof.

Id.—Use of Corporate Property by Officer — Notice of Lack of Authority.—An officer of a corporation has no authority to use the corporate property for his own benefit, and such use is notice of lack of authority.

Id.—Principal and Agent—Knowledge of Agent—When not Imputable to Principal.—A principal is not charged with knowledge of his agent where the latter is engaged in a transaction beyond his authority, and in which he is interested adversely to the principal.

Id.—Doctrine of Bona Fide Holder Inapplicable.—Where the secretary of a building and loan association without authority indorses a check payable to the association to a bank, the doctrine of *bona fide* holder without notice does not apply as between the association and the bank, for they are parties in privity; nor is the bank an indorsee in due course as defined by sections 3123 and 3124 of the Civil Code.

Id.—Use of Proceeds of Check—Benefit of Association—Lack of Estoppel.—The fact that the association suffered no loss by reason of the fact that the money obtained from the cashing of the check was used to secure title to property upon which the association held a mortgage does not estop the association from recovering the amount of the check from the bank.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Frank J. Murasky, Judge.

The facts are stated in the opinion of the court.

Green, Humphreys & Green, for Appellant.

J. S. Hutchinson, Cushing & Cushing, and Walter Slack, for Respondent.

BURNETT, J.—The suit is for the conversion of a check for seven thousand five hundred dollars and the proceeds thereof. The answer denies the conversion and sets up the special defense that plaintiff discounted and cashed the check at defendant's bank, that the money was appropriated for the benefit of plaintiff, and that the demand in suit has been paid. Respondent is a building and loan association and appellant a national bank, both doing business in Palo Alto. Appellant was not the bank of deposit of respondent, the banking business of the latter being done at the Bank of Palo Alto. One Marshall Black was the secretary of respondent but held no other position therein. Appellant bank was located in the same block as respondent's place of business, while the Bank of Palo Alto was three blocks distant. Plaintiff's ownership of the check was admitted by the pleadings, said check being in the following form:

"$7500.

"Daniel Meyer    San Francisco, Cal. May 5 1910 No. 1601

"The Anglo & London Paris National Bank of San Francisco

"Pay to the order of Palo Alto M B & L Ass'n $7500 00/100 Seventy five hundred 00/100 dollars

"DANIEL MEYER."

Black indorsed the check as follows: "Pay to the order of First National Bank Palo Alto Mut Bld & Loan By Marshall Black, Secretary," and delivered it to appellant. At that time two deeds respectively from Annie MacIntyre and Alexander MacIntyre to Black, covering a tract of land in Palo Alto, were on deposit in escrow with appellant to be delivered to Black on the payment of $7,366.40. Appellant received the check so indorsed and delivered without the actual knowledge of respondent, and applied the proceeds as follows: It credited the account of Alexander MacIntyre at the bank with the sum of $2,755.25 and applied $4,611.15 on a promissory note then due from MacIntyre to appellant, thus paying the note. Of the former amount it remitted MacIntyre $2,366 in cash and applied what remained apparently to an overdraft due from MacIntyre to itself. The balance of $133.60 it paid to Black in cash. It then delivered said deeds to Black, who thus acquired title to said property. Prior to March, 1910, Black had organized a corporation known as the "Marshall Black Investment Company," of which he was the president and manager, and owned practically all the stock.

On March 22, 1910, the Investment Company, through Black, applied to respondent for a loan of seven thousand five hundred dollars upon the security of said land standing then in the name of the MacIntyres. The application for the loan was approved, the money advanced, and Black, on receiving the deeds from the MacIntyres, conveyed the property to said Investment Company, which had executed a mortgage on the property to respondent for the said sum of seven thousand five hundred dollars.

On November 29, 1911, the Investment Company, in consequence of the release of the mortgage and other considerations, executed to the San Jose Abstract Company, as trustee for the benefit of respondent, a trust deed covering said property as security for said indebtedness to respondent. The sum secured thereby was eight thousand five hundred dollars, value actually received by said company, and, until September, 1912, respondent had no knowledge of the misappropriation of the separate and independent sum of seven thousand five hundred dollars covered by the check involved herein. About this time it became known that Black was a defaulter to the extent of over one hundred thousand dollars, and the facts concerning the transaction between him and appellant, as to said check, came to light. On account of said defalcation the building and loan commission of the state compelled respondent, pending investigation as to its financial condition, to suspend business. The suspension continued from October 1, 1912, to December 14, 1912, when, after the adoption of a plan of reorganization of the finances by the directors and stockholders in compliance with the demand of said commissioner, the association was permitted to resume business. This plan is fully set forth in the findings, and it amounted substantially to a sufficient reduction in the value of the stock of the stockholders to cover the deficit caused by Black's defalcations, thus making it appear that the assets of the association equaled its liabilities. In consenting to said plan the board of directors of respondent adopted the following resolution: "Be it further resolved that the acceptance and carrying out of said plan or any charge or entry made pursuant thereto, or otherwise shall not be, or be deemed to be, in any manner a waiver by this corporation of any right it may have to in any manner enforce any claim, liability or obligation whatsoever due from any debtor or party in any

manner involved in or connected with the loss referred to in said plan and generally known as the Marshall Black deficiency.''   The same resolution was adopted at the stockholders' meeting.

Counsel on both sides have displayed great industry and ability in presenting their views as to the legal propositions involved, and seemingly have exhausted about all the learning on the subject.   The discussion has, indeed, taken a wide range, and we cannot within reasonable limits follow it in all its ramifications.

We think the contentions of appellant have been satisfactorily answered in the brief of respondent, and as far as specific attention is paid to them we shall probably do little more than present a synopsis of the argument contained in said brief.

As to the authority of Marshall Black to represent respondent, upon which appellant lays much stress, the court found as follows: ''That at all times mentioned in said complaint and for several years immediately prior to May 6, 1910, one Marshall Black was the secretary of plaintiff, but did not hold any other office in the said plaintiff, and was not a director thereof.   That during all of said time the business of plaintiff was managed and controlled by a board of directors, and said Marshall Black (as such secretary) had charge of the business of said plaintiff corporation, subject to the control and supervision of the board of directors of plaintiff, except as otherwise found herein.''   There is abundant evidence for the support of this finding, notwithstanding appellant's contention that Black was literally in control of the business, that he was permitted to handle the business of the association as he saw fit, and that the directors took no part in its management and never examined its books and records. Appellant makes a common mistake, to which we have had occasion before to advert, in that it has directed attention to evidence opposed to said finding but has ignored what is favorable thereto.   Respondent calls attention to some twenty matters of importance in the business of the association which had been directed and supervised by the board, as shown by the evidence.   These we need not enumerate, but they are sufficient to justify the conclusion of the court, and they certainly negative the claim that the board abdicated its authority and abandoned its functions to be exercised by Black.

We think it can safely be said that the association was actually under the supervision and control of said board, and that Black was authorized to discharge only the duties that usually belong to the office which he held, although we could not affirm with much confidence that said board of directors "were particularly vigilant and active in guiding its affairs." Like many other similar boards, they were disposed to withhold their personal individual attention from the exercise of the duties of the secretary in the business of the concern, believing, no doubt, that these matters could and would receive effective consideration from said officer. If the directors had been as active and vigilant as they should, it is quite probable that the rascality of Black would have been discovered much earlier, to the great advantage of the association and its stockholders. It is but a truism to say that directors of such organizations generally confide too much in the honesty of their ministerial officers, and are too prone to delegate to the latter services which should be performed or personally supervised by the directors themselves. The misplaced confidence in an unworthy agent herein disclosed finds many a parallel in the history of such organizations, and the serious and deplorable consequences of such confidence should be a lesson to those charged with the duty of managing these important concerns involving the interests of those illy prepared to experience financial loss.

However, in the apparent remissness of the directors herein we find no comfort for appellant nor warrant for its claim that any loss occasioned by this particular transaction is chargeable to their negligence.

Another finding of which complaint is made is the following: "That on various occasions prior to May 6, 1910, Marshall Black, as a matter of convenience in operating the office of said plaintiff, did from time to time cash some checks or drafts payable to the order of said plaintiff at the office of said defendant. . . . That none of the checks so cashed amounted to a greater sum than five hundred dollars, excepting one check, the transaction involved in the cashing of which is now in controversy and litigation, and the acts of said Marshall Black in cashing said checks were not, nor was any thereof, brought to the knowledge of plaintiff corporation, its officers or directors, and neither the said plaintiff corporation, nor its officers or directors, other than said Mar-

shall Black, had any knowledge thereof, and said Marshall Black never communicated the fact of the cashing thereof to plaintiff. That the discounting or cashing of notes, drafts or bills of exchange by said Marshall Black with defendant was carried on under the circumstances as herein stated and not otherwise and never became nor was at any time nor at all an established or any practice or custom. That said corporation plaintiff never at any time or at all, either directly or indirectly, ratified or acquiesced in, or confirmed or approved the said acts of said Marshall Black in cashing said checks or drafts. That neither the articles of incorporation, nor the by-laws of said plaintiff, ever at any time or at all authorized or empowered said Marshall Black or any other person as such secretary or otherwise, or at all, to cash or discount checks or drafts or bills of exchange for any purpose whatever or otherwise, or at all.''

We think there is no ground for the contention that this finding in any respect is unsupported. There may be evidence in the record that would warrant a contrary finding as to some of the facts enumerated, but of course that is of no consequence here. Respondent calls attention to the specific portions of the transcript wherein is found testimony in harmony with the views of the court as thus expressed, but it is not deemed necessary to set it forth herein.

We are of the opinion that there is no more merit in the objection to the finding as to the payment of seven thousand five hundred dollars as a loan to the Investment Company. There was undoubtedly an irregularity in advancing the money before the loan was approved by the board and before the notification by the attorney that all legal requirements had been complied with, but the irregularity was cured by the subsequent approval and ratification of the loan by the directors. In fact, it seems to have been approved a second time on May 10, 1910, four days after the deed to the property came into the possession of plaintiff. Aside from that, it must be true that the borrower who actually obtained the loan could not object to any irregularity in the proceedings whereby he secured it, and, of course, appellant is in no better position to complain.

The trust deed given in place of said mortgage and in release thereof was to secure the payment of eight thousand five hundred dollars. This included the amount of one thousand

dollars in interest, and we can see no possible reason for an objection to this any more than to the principal of the indebtedness. Manifestly, they stand upon the same footing as to the consideration for the security.

We can perceive no merit in the claim that "the liability of respondent arising out of Black's defalcations have been paid, satisfied, and canceled as shown by the 'Marshall Black Deficiency Account.'" It is quite apparent that there was no actual payment to respondent of the proceeds of said seven thousand five hundred dollar check. We have already detailed the disposition that was made of the money. There is nothing to show that any part of it ever came into the possession of respondent, or that the loss by reason of the misappropriation of the fund was ever made good either entirely or partially. It is equally plain, from the resolution passed as aforesaid by the directors and the stockholders, that there was no intention, by reason of said deficiency account or otherwise, to satisfy and cancel said obligation. The actual loss by reason of the defalcations of Black was over one hundred thousand dollars, but, in order to satisfy the building and loan commission and to secure permission to resume business, it seems that the capital stock, reserve fund, undivided profits, etc., were reduced or written down to the extent of the loss. This, as stated by respondent, was a matter of bookkeeping and adjustment of the various accounts to satisfy the said commission that the concern was solvent and entitled to do business; or, in other words, the large sums credited to said deficiency account were simply written off the value of the stockholdings. We can see nothing in the transaction that should be construed as operative to extinguish respondent's claim to compensation for the conversion of said check. The amount received, as we understand it, although nominally for the corporation is actually for the benefit of the stockholders who have suffered the loss.

In this connection, it may be said that we view similarly the contention that the amount received on Black's bond should be credited *pro rata* on this claim. The question is really one of subrogation which concerns only respondent and the Surety Company.

Thus far there seems but little room for debate, but some other points made by appellant probably possess more merit.

The question of agency in its various aspects has received much attention, and it is claimed that in accordance with its well-established principles the act of Black in cashing the check must be regarded as the act of respondent. We do not so understand the law and the facts.

It is plain that Black had no express authority to indorse the check, and this has already been sufficiently considered. It is also true that he had no such authority simply by virtue of his office as secretary. (*Blood* v. *Marcuse*, 38 Cal. 590, [99 Am. Dec. 435] ; 3 Cook on Corporations, 6th ed., sec. 717.)

Likewise it must be admitted that in the absence of authority, express or implied, he cannot transfer his principal's property, and such authority will not be presumed. (*Read* v. *Buffum*, 79 Cal. 77, [12 Am. St. Rep. 131, 21 Pac. 555] ; *California Winemakers' Corp.* v. *Sciaroni*, 139 Cal. 277, [72 Pac. 990].) Beyond that, an officer of a corporation can have no authority to use the corporate property for his own benefit, and such use is notice of lack of authority. (Civ. Code, secs. 2230, 2234, 2306, 2322.) Directors and officers of corporations are agents and trustees within the contemplation of these sections of the code. (*Graves* v. *Mono Lake etc. Mining Co.*, 81 Cal. 303, 319, [22 Pac. 665] ; *Pacific Vinegar & Pickle Works* v. *Smith*, 145 Cal. 363, [104 Am. St. Rep. 42, 78 Pac. 550].)

In relation to this question some interesting cases are reviewed by respondent.

In *Hubback* v. *Ross*, 96 Cal. 426, [31 Pac. 353], one Makin desired to obtain money from plaintiff in connection with certain shipments and plaintiff drew bills of exchange upon his correspondents in Liverpool and delivered them to Makin. Plaintiff demanded security of Makin and the latter presented a deed from Ann S. Ross to plaintiff conveying certain property. Makin delivered the deed for the bills of exchange running to himself. The action was brought to foreclose the deed as a mortgage and defendant denied that it was given for the purpose declared by plaintiff. The latter claimed that Makin being intrusted with the conveyance had at least apparent authority to deliver it for the purpose of securing his personal obligation, but it was held that the apparent authority was limited, by one of the fundamental principles of agency, to the right to deliver it only as a security for some obligation of his principal, and, further, that plaintiff was not

justified, as a matter of ordinary prudence, in presuming that Makin might use the instrument for his own benefit and purpose.

In the Smith case, *supra,* the court had under consideration the indorsement of a corporate obligation by the president of a company to himself. Therein it is said: "It is hardly necessary to say that the general power conferred upon Smith under the by-laws did not give him authority to contract with himself. In every case where the validity of a contract made by a trustee with himself is in question, general authority to act for the corporation must necessarily have existed in order to apply the principle invoked here. The law assumes that the trustee is invested with general power to contract, but limits its exercise to matters strictly in the interest of the beneficiary, and disqualifies him from exercising it in his own behalf. This disability directly results from the existence of the general authority."

The same rule is enforced in the late case of *Western States Life Ins. Co.* v. *Lockwood,* 166 Cal. 185, [135 Pac. 496], wherein, in reference to the president of plaintiff, it is said: "It is universally held as a consequence of this doctrine that he may not on behalf of the corporation contract with himself as an individual, which of course includes contracting with others with whom he has an interest, without the full knowledge and approval of the corporation."

Among the many cases cited from other states we refer only to *Ward* v. *City Trust Co. of New York,* 192 N. Y. 61, [84 N. E. 585]. Therein, it seems, certain officers of Hartman Manufacturing Company obtained a check for one hundred and twenty-five thousand dollars from Hanover Bank, payable to the order of Hartman Company, by falsely representing that the loan was secured for said company. One of these officers indorsed the check in the name of Hartman Company by himself as president and general manager, and delivered it to the City Trust Company in payment of his personal note. The referee in the lower court found that the defendant Trust Company acted in good faith and concluded that it was a *bona fide* holder for value. The court of appeals reversed this decision, holding that the defendant was not justified in taking the check for the personal obligation of the president, and that it could not be a *bona fide* holder of the obligation. Therein it is said: "The form of

the check in question was notice to the trust company that Umsted was using the property of the corporation of which he was president to pay the personal debt of himself and Kiefer in apparent violation of its rights. . . . The effect of such notice was to put the trust company upon inquiry to see whether it was about to accept money from one to whom it did not belong in payment of its own claim.   The presumption arising from the face of the check was that it belonged to the Hartman Company, and that its president had no right to use it to pay his personal debt.''   It was also held that the broad power conferred upon the president of the corporation was not sufficient to authorize him to give away the assets of the company or to use them to pay the personal debts of its officers.   Emphasis is laid upon the proposition that by reason of the fact that the check showed upon its face that it belonged not to Umsted or Kiefer but to the Hartman Company, there was a ''shadow'' upon it, and the defendant could not in good faith accept it until the shadow had been removed.   It is declared that ''While the courts are careful to guard the interests of commerce by protecting the negotiation of commercial paper, they are also careful to guard against fraud by defeating titles taken in bad faith, or with knowledge, actual or implied, which amounts to bad faith, when regarded from a commercial standpoint.''   Of course, it is true, as pointed out in the decision, that if reasonable inquiry would have led to the discovery of facts which would have dispelled any suspicion, the purchaser of the paper is entitled to the benefit thereof as if he had made proper investigation.   That is self-evident, being equivalent to saying that if the agent had ample authority in the premises, the want of knowledge thereof by the purchaser would not invalidate the transaction.   Manifestly, it is only in the case where the agent lacks authority that the principal may exact the duty of inquiry and that the failure to inquire imposes a penalty upon the purchaser.

The Ward case, *supra,* substantially covers most of the principles of law involved herein, but we append the other cited cases as instructive on the subject: *M. Jacoby & Co.* v. *Payson,* 85 Hun, 367, [32 N. Y. Supp. 1032]; *Knoxville Water Co.* v. *East Tennessee Nat. Bank,* 123 Tenn. 364, [131 S. W. 447]; *Germania Safety-Vault & Trust Co.* v. *Boynton,* 71 Fed. 797, [19 C. C. A. 118]; *Claflin* v. *Farmers & Citi-*

*zens' Bank,* 25 N. Y. 293; *Robinson* v. *Chemical National Bank,* 86 N. Y. 404; *Bank of New York N. B. A.* v. *American Dock & Trust Co.,* 143 N. Y. 559, [38 N. E. 713]; and also Randolph on Commercial Paper, sec. 368, and Thompson on Corporations, sec. 1700.

One feature or incident of agency to which appellant has adverted at considerable length is embraced in the term, ''imputation of knowledge to plaintiff.'' This, however, is nothing but a phase or circumstance of express, implied, or ostensible authority. The knowledge of the agent is considered and imputed as the knowledge of the principal only when the former acquires it in the course of his agency. If he does not acquire it while acting within the scope of his authority, the knowledge is no more to be imputed to the principal than to an utter stranger. The imputation has been held to rest upon the presumption that the agent will communicate such knowledge to his principal. Manifestly, no such presumption can exist where the agent is engaged in a transaction beyond his authority and in which he is interested adversely to his principal or in a scheme to defraud his principal. In *McDonald* v. *Randall,* 139 Cal. 246, [72 Pac. 997], it was said ''a corporation is not chargeable with the knowledge of one of its officers or agents who is acting on his own behalf, and not for the corporation,'' and in *McKenney* v. *Ellsworth,* 165 Cal. 326, [132 Pac. 75], the court says: ''Where an agent of a corporation is dealing with the corporation in a transaction in his own behalf, it will not be presumed that he will communicate to his principal facts affecting the transaction.'' An exception is recognized to the rule where the principal is in fact represented in the whole transaction solely by the party as agent. Herein plaintiff was not represented by Black in the matter of the loan to the Investment Company, since he dealt with respondent through its board of directors, its security committee, and attorney. Respondent would not, therefore, be charged with constructive knowledge of Black's misapplication of the fund. But if the presumption existed, it would be a disputable presumption, and the court has found, on sufficient evidence, that the plaintiff had no knowledge of these things. The doctrine manifestly cannot be applied to the extent and end claimed by appellant. The contention resolves itself to this: that the principal, if he has knowledge of the exercise by the agent of certain powers, is

bound by the act of the agent, and he must be held to have such knowledge from the fact that the agent knows of it himself. Such doctrine, of course, could not be maintained, as it would place it within the power of an agent to bind the principal to any course of conduct however foreign or obnoxious to the authority actually conferred.

There is no doubt that the circumstances might be such as to estop the principal from denying the authority of the agent. That is a familiar principle, but it does not apply here. The acts of the agent may be so open and frequent as to create and compel the inference of acquiescence on the part of the principal. But they must be acts of a similar nature. Here there is no evidence that Black had before applied the corporate property in substantially the same manner. The elements of ostensible agency to do the thing which was done are entirely lacking, and we can see no reason for invoking the principle contended for that "a corporation is bound by the powers that its agent is permitted to exercise openly."

What has been said, we think, disposes of the contention of appellant that it was a *"bona fide* purchaser for value without notice." It cannot be said to be a purchaser "without notice," since, as we have seen, it was put upon inquiry, and it must be held to know what it could have found out by investigation. In *Smith* v. *Los Angeles Immigration etc. Assn.,* 78 Cal. 289, [12 Am. St. Rep. 53, 20 Pac. 677], the court says: "The fact that the note appeared upon its face to have been executed by Garey on behalf of the corporation was sufficient to charge his assignee with notice of want of authority to execute it."

In Randolph on Commercial Paper, section 1012, the rule is stated: "In like manner, one cannot become a *bona fide* holder of a check drawn by a bank president on his own bank, and certified by himself, or of a certificate of deposit given by a bank cashier in the name of a bank, and indorsed and deposited by him to his own credit."

And, as pointed out by respondent, the controversy here is between plaintiff, the payee of the check, and appellant as indorsee. They are parties in privity, and, strictly speaking, the said doctrine does not apply as between the immediate parties to the transaction. The rule is stated in Daniels on Negotiable Instruments as follows: "It is a general principle of the law-merchant that, as between the immediate parties

to a negotiable instrument—parties between whom there is a privity—the consideration may be inquired into, and that as to them the only superiority of a bill or note over other unsealed evidences of debt is, that it *prima facie* imports a consideration.''

Nor is the situation changed within the contemplation of sections 3123 and 3124 of the Civil Code, as appellant is not an ''indorsee in due course'' as therein defined. Among the many authorities as to this point it is sufficient to refer to Judge Cooley's opinion in the case of *McLellan* v. *Detroit File Works,* 56 Mich. 579, [23 N. W. 321], where a partnership had issued promissory notes and thereafter transferred its property to the corporation which assumed certain indebtedness, excluding, however, the notes of plaintiff. The president of the corporation, though, renewed the notes to plaintiff by giving him corporation notes. It was said: ''The case was such that the plaintiff must be deemed to have accepted renewal of the notes with knowledge of all the facts. They held partnership notes, and they accepted corporation notes in renewal; and they must be deemed to have known that an officer of a corporation can have no general authority to give the notes of the corporation to take up the outstanding obligations of members. Special authority would be required to empower him to do so; and those persons who should venture to take such notes from him must, at their peril, ascertain that the special authority has been conferred.'' Furthermore, it was declared that ''a corporate note given for an individual obligation is not given in the regular course of business, but, presumptively, is *ultra vires.* An officer of a corporation can never have implied authority to give such notes. . . . The general authority to make commercial paper in the name of a corporation is given to be exercised for the benefit and in the business of the corporation, not for the benefit or in the business of others, and it is therefore obvious that one who takes such paper with knowledge that it is not given for a corporate purpose can have no claim to the protection which the law accords to a *bona fide* holder.''

Another point made by appellant, worthy, probably, of some notice, is that respondent suffered no loss by reason of the fact that the money was used to secure title to the property upon which respondent had a mortgage for seven thou-

sand five hundred dollars. The contention seems to be that if the proceeds of said check had not been applied to the purchase of said property, respondent would have lost the seven thousand five hundred dollars which it had already loaned on the strength of the security. However, there does not appear to be merit in the defense that if the seven thousand five hundred dollars had not been misappropriated another equal amount would have been lost. A thief who admits a theft and his use of the money for his individual benefit could hardly find justification or excuse in the plea that by his unwarranted use of the money he saved the owner the loss of another similar amount. Respondent was entitled to the security and also the proceeds of the check. Nor does it appear that the additional seven thousand five hundred dollars could have been realized out of the property. The amount of the various encumbrances made in good faith greatly exceeded its value, and while respondent was enabled to secure the repayment of the said sum of eight thousand five hundred dollars covered by the trust deed, there is nothing to show that the other amount misappropriated by Black could have been obtained. Nor can we agree with appellant "that plaintiff cannot retain the advantage derived from the renewal deed of trust executed in 1911, and at the same time insist that such retention does not constitute a ratification of Black's unauthorized act." The doctrine of ratification is gone into pretty thoroughly in the briefs. The principle is reiterated by respondent that it is necessary, in order to effect a ratification, that action be taken with full knowledge of the facts (Civ. Code, sec. 2310; *Hall* v. *E. W. Wells & Son*, 24 Cal. App. 238, [141 Pac. 53]; *Lambert* v. *Gerner*, 142 Cal. 399, [76 Pac. 53]), and attention is directed to the fact that when respondent took said renewal and mortgage it had no knowledge of Black's appropriation of the check; hence there was no such ratification.

Again, assuming that respondent was benefited, the situation is covered by the doctrine announced in 2 Corpus Juris, section 133, as follows: "Where, however, when the principal first acquires knowledge of the facts, conditions are such that he cannot in justice to himself repudiate the whole of the agent's acts he may stand upon what he has authorized, and the third person must bear the loss resulting from his dealing with an agent without learning the extent of his authority."

Other qualifications of the doctrine are pointed out which lead to the conclusion that by taking said security respondent did not ratify the act of Black or of appellant in said transaction as to the check, but we forego specific mention of them.

We are satisfied that Black had no authority, express or implied, for the indorsement of said check, that no authority, however broad, could have authorized him to cash the check for his own benefit, that appellant was put upon inquiry as to the limit of his authority, and that it must be deemed to have known that he was not acting within the scope of his agency, that appellant converted the property without authority of law, that respondent has not been paid the amount nor any portion thereof, that it is not estopped by reason of having received the benefits of the transaction or otherwise from recovering the proceeds of said check, that it has not ratified the said unauthorized act of Black, and that it has been damaged to the extent claimed by the conduct of appellant in cashing said check.

The judgment and order are therefore affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 10, 1917.