[Sac. No. 5729.   In Bank.   June 3, 1947.]

CHARLES A. BLISS et al., Respondents, v. CALIFORNIA
    COOPERATIVE PRODUCERS (a Cooperative Corpo-
    ration) et al., Defendants; I. C. SHIDLER et al., Ap-
    pellants.

B. J. Galbreath, in pro. per., and Muldary & Elkington for Appellants.

Charles A. Bliss, Irvin C. Ford and C. K. Curtright for Respondents.

Albert C. Agnew, John A. O'Kane, Louis Ferrari, Brobeck, Phleger & Harrison, Randall Boyd, Morrison, Hohfeld, Foerster, Shuman & Clark, Richard W. Young, Cooley, Crowley, Gaither & Dana and Wm. J. Murphy as Amici Curiae, on behalf of Respondents.

CARTER, J.—Judgment was given for plaintiffs against defendants and appellants Shidler, Winchester and Galbreath on three promissory notes of which they were the makers. Their defenses, among others, were fraud and failure of consideration. Plaintiffs are the transferees of the notes, the payee being California Cooperative Producers, a corporation.

The series of events leading up to the execution of the notes had their beginning in 1926. In that year the idea was conceived by Mr. Johnson, president of the Union Construction Company, and a Mr. Campbell, to use the shipping terminal facilities and property at the harbor in Oakland, California, then held by the Union Construction Company under a lease from the city of Oakland, for a terminal for processing and shipping agricultural products. It was proposed to form a corporation to be known as California Cooperative Producers (hereinafter referred to as the corporation, which was later formed), as the instrumentality to conduct the enterprise. A promotional firm, Allen, Hobson and Simons, a copartnership, was engaged under contract of April 15, 1927, to promote and organize the business and conduct a campaign to induce growers of agricultural products to let the corporation handle their products. The corporation was incorporated on April 26, 1927, with a capital stock of $15,000 under the then section 653(a) of the Civil Code authorizing ordinary business corporations to divide a portion of their profits among persons other than their stockholders. The stock (other than director's qualifying shares) was to be issued only to associations of producers (which were to be organized) who marketed their products through the corporation. Johnson was named president and Hobson and Allen directors of the corporation. Pursuant to a permit therefor one share of stock was issued to each director.

The promotional firm launched its drive, made financial arrangements, and obtained manufacturing and marketing contracts, hereafter called marketing contracts, for the corporation from many producers of agricultural products, including the three appellants, in which the producers agreed

to market their products through the corporation. Appellants, as producers, were members of either one or the other of two producer's associations formed pursuant to the plan. The associations' manufacturing and marketing agreement, hereafter referred to as association contract, with its member-producers and the marketing contracts required its members to deliver their products to the corporation. The marketing contracts called for the procurement of policies of insurance on the lives of the producers, the corporation to pay the premiums, and provided: ''In order to assist in the manufacturing and/or marketing of said products, and in further consideration of the payment of the premiums on policies of endowment life insurance on the life (name of defendant signing same) for the amount of (amount of insurance issued), if and when issued and assigned to California Cooperative Producers, said producer hereby extends his credit to California Cooperative Producers in the amount of a certain promissory note of even date herewith in the principal sum of $——— (amount of note executed, and sued for herein) made by said producer in favor of said California Cooperative Producers.'' The notes involved were executed in 1927 as a part of the transaction by appellants and were noninterest bearing negotiable instruments payable in annual installments. The principal of the notes was arrived at by an estimate of the annual produce to be delivered by the producer and maker of the note to the corporation.

On April 17, 1928, the corporation pledged the notes to plaintiffs, together with others, as security for the payment of a note for $5,000 in which the corporation was maker and plaintiffs payees. The pledge was made in the usual course of business and under circumstances which would indicate that plaintiffs were holders in due course and thus the defenses urged would not be available unless some other factor took them out of the favored position.

The court found that plaintiffs acquired the notes in good faith and without notice of any defenses of appellants. (As above stated, the defenses were fraud and failure of consideration.) The first installment on the principal of appellants' notes became due on January 2, 1928. The transfer (on April 17, 1928) was after that date, hence we have the issue of whether a transferee of an installment note is a holder in due course where the transfer is made after one or more but less than all of the installments are due. (In this connection

it should be noted that in the instant case the notes did not contain an automatic acceleration clause upon default in the payment of an installment, thus we do not decide the law in that situation.)

On the issue of whether or not the transferee of a negotiable installment note taken after the maturity of one or more or less than all of the installments, is a holder in due course, reference must first be made to the negotiable instruments law as embodied in our statutes: "A holder in due course is a holder who has taken the instrument under the following conditions: (1) . . . (2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact"; (Civ. Code, § 3133.) "The instrument is dishonored by nonpayment when (1) . . . (2) Presentment is excused and the instrument is overdue and unpaid." (Civ. Code, § 3164.) To determine whether a note is "overdue" when less than all of the installments are unpaid it must be noted that installment notes are expressly made negotiable by the statute. "The sum payable is a sum certain within the meaning of this act, although it is to be paid—(1) . . . (2) *By stated installments;* or (3) By stated installments, with a provision that upon default in payment for any installment or of interest, the whole shall become due" [emphasis added] (Civ. Code, § 3083), and the policy is stated: "There is no doubt that the fact that a note is payable by instalments does not destroy its negotiability. The authorities seem to be in favor of the continued negotiability of the note after the indorsement of payments thereon. In case of an instalment note, the time for the payment of each instalment is fixed so that it is within the rule requiring certainty as to time of payment. By the Uniform Act it is declared that the sum payable is a sum certain although it is to be paid by stated instalments." (7 Am.Jur., Bills and Notes, § 150.) This policy would be impaired if a note became in effect nonnegotiable before less than all of the installments became due. A vast number of credit transactions might be thus jeopardized. As to the installments that have become due the transferee cannot be a holder in due course, for that portion of the note is undoubtedly overdue but as to the future installments he may or may not be such a holder, depending upon the factors presently discussed.

It has been stated repeatedly, as a general proposition, under the negotiable instruments law and the common

law that the transferee of an installment note is not a holder in due course as to any part of the note when the transfer has been made after the maturity of one or more but less than all of the installments. (Cases in which uniform negotiable instruments law not mentioned: *Hall* v. *E. W. Wells & Son,* 24 Cal.App. 238 [141 P. 53]; *Archibald Hardware Co.* v. *Gifford,* 44 Ga.App. 837 [163 S.E. 254]; *General Motors Acceptance Corp.* v. *Talbott,* 39 Idaho 707 [230 P. 30]; *Vinton* v. *King,* 4 Allen (Mass.) 562; *McCorkle* v. *Miller,* 64 Mo. App. 153; turns on lack of payment *Shadman* v. *O'Brien,* 278 Mass. 579 [180 N.E. 532]; *Norwood* v. *Leeves* (Tex.Civ.App.), 115 S.W. 53; *First Nat. Bank* v. *Forsyth,* 67 Minn. 257 [69 N.W. 909, 64 Am.St.Rep. 415]. Cases decided under the uniform negotiable instruments law: *Hibbard* v. *Collins,* 127 Me. 383 [143 A. 600]; *City of New Port Richey* v. *Fidelity & Deposit Co.,* 105 F.2d 348 [123 A.L.R. 1352]; *United States* v. *Capen,* 55 F.Supp. 81; see 10 C.J.S., Bills and Notes, § 312; Daniels on Negotiable Instruments [7th ed.], vol. 2, § 910; 44 Harv.L.Rev. 464; 40 Harv.L.Rev. 634; 8 Am.Jur., Bills and Notes, § 432; 64 A.L.R. 457.) These cases stress the point that the installment was unpaid as well as being overdue on its face, a factor of significance. More is required. There would be little free commerce in installment instruments if before accepting the same the transferee was required to ascertain whether or not the past due installments had been paid. Thus he may assume that the regular course of business has been followed (Code Civ. Proc., § 1963), and that each installment was paid when due. It is not significant, like it is where the whole principal is overdue, that the note is still in the hands of the payee or holder. Where the whole principal is overdue, that should warn the transferee that the note probably has been dishonored and there may be some reason for it which would constitute a defense. The possession by the payee or holder of an installment note before all of the installments are due does not signify dishonor. The holder would necessarily retain it for collection of the balance of the installments. If, however, the installments due on the face of the instrument have not been paid and the *transferee has notice of that fact,* he is put on inquiry that there may be some defenses against it and he cannot be a holder in due course. It is said in *United States* v. *Capen,* 55 F.Supp. 81, 83: ''Where the principal of a note is payable in installments and one installment is overdue and unpaid at the time of

transfer of the note, the transferee is not a holder before maturity and hence is not a holder in due course, *unless he does not take with notice* of the past-due installment." [Emphasis added.] Therefore, the rule is that a transferee of an installment note is a holder in due course as to the installments to mature in the future when the transfer is made after one or more but not all of the installments are due on its face unless the past due installments have not in fact been paid and he has notice of that fact.

The decision in this case must turn on whether the installment due on January 2, 1928, had been paid, and if not, whether plaintiffs had notice thereof. In regard to payment of the first installment, plaintiffs alleged in their complaint that no part of the principal had been paid on any of appellants' notes, an allegation in substance that the first installment had not been paid. That allegation was denied by appellants, which amounts to an assertion that the installment had been paid. We thus have the peculiar situation of plaintiffs and appellants taking positions in their pleadings opposite to their interests under the rule of law as above stated. Under that rule plaintiffs' position now requires a claim that the installment was paid, and appellants, that it was unpaid. The court found that all of plaintiffs' allegations were true, thus finding that the first installment had not been paid. It also found (and it would seem to be conflicting) that pursuant to the marketing contracts appellants delivered produce to the corporation in 1927, and the corporation on August 31, 1928 (*after* the transfer of the notes) entered credits on its books for the first installment; that plaintiffs were not holders in due course because the notes were transferred after the first installment was due but that "plaintiffs were purchasers and holders of said notes in good faith and for value and without notice of any equity or defense in favor of defendants or any of them; and in this connection the court finds that in each instance said California Cooperative Producers had in its possession and under its control pursuant to and under the said Financing and Manufacturing and Marketing Agreement on said 2nd day of January, 1928, money, property or credits belonging to each of said defendants, being the products or the proceeds of the products of such defendants, delivered pursuant to said Financing and Manufacturing and Marketing Agreement sufficient in value or amount to pay, satisfy and discharge the amount of said First Installment

payments of each of said respective promissory notes in full."
The court further found that the notes were not to be paid
by credits for fruit delivered by the growers (appellants)
stating: "It is not true that it was represented by said Pro-
ducers to said defendants [appellants], or any of them, that
no payment would be required to be made by the signers of
said notes; or that as each yearly installment became on the
face of the note due or payable to said California Cooperative
Producers, said California Cooperative Producers would debit
the balance of the amount of the yearly installment then due
to said signer of said note or charge the same against said
signer's credit balance, if any, or that thereafter said Pro-
ducers would assign said sums or any sum, to corporate re-
serves, or any reserves, except as is stated in said Financing
and Manufacturing and Marketing Agreement." The court
gave judgment for plaintiffs which included the first install-
ment in the instance of appellant Winchester, but not as to
the other two appellants. The conclusion as to the latter
appellants was based, however, on the finding that the statute
of limitation had run upon the first installment as to those
appellants. It is evident from the foregoing that the court
found that the crop which had been delivered to the corpora-
tion by appellants *did not constitute payment.* Although it
found the existence of the credits by the delivery of the crop
it found *that the first installment had not been paid* and gave
judgment for it, thus indicating that it considered that the
credits did not constitute payment, a matter which may have
turned on the intention of the parties. Therefore, it has been
determined in this case that the first of the two conditions,
that is, nonpayment of the past due installment, which makes
a transferee after maturity of one of the installments not a
holder in due course, is present.

On the subject of notice to plaintiffs of appellants'
failure to pay the first installment, the findings are unsatis-
factory. It is found that they (plaintiffs) were bona fide
holders without notice of any defenses, but it is also found
that they were not holders in due course. They may not have
had notice of any defenses, yet they may have had notice of
the default and thus were put upon inquiry. In the latter
event they would not be holders in due course. It is evident
from the findings that the court did not consider the case in
the light of the law as heretofore stated. The evidence with
reference to the existence of notice is sketchy. Precisely what

was done and said when the notes were transferred is not clear. The $5,000 note for which the instant collateral notes were given as security states: "This note is secured by a pledge of the following installment notes, payable to the order of the maker hereof." Then follows three columns designated "Name of Maker," "Date of Note" and "Amount," respectively, under which each note is listed *giving the full face amount of the note.* It might be inferred from the foregoing that the first installment had not been paid. In the state of the evidence and the findings we believe the issue of notice should be retried. In the event it is found that plaintiffs had notice, and were not therefore holders in due course, for the guidance of the court we will discuss the issues pertinent to the defenses interposed by appellants.

Thus turning to appellants' defenses, the court found that the corporation and its officers were the agents of appellants in the marketing of their products. The stock of the corporation was to be issued to associations of producers. The corporation was "in effect owned" by the associations of which appellants were members. The notes executed by appellants were part of the same transaction in which they executed the marketing and association contracts. The interest on the $5,000 note delivered to plaintiffs by the corporation was paid until July 17, 1930, but none of the principal was paid although $4,000 of it became due before that date. On the issue of appellants' defense of failure of consideration or failure by the corporation to perform under the marketing contract, it appears that the corporation failed to pay the premiums on the insurance policies after July, 1930; that because of its insolvency, it has failed to and could not since then pay such premiums or process, manufacture or market appellants' products. Failure of consideration is a good defense to an action on a negotiable instrument by one not a holder in due course. (Civ. Code, § 3109.) ▪ Failure of consideration is the failure to execute a promise, the performance of which has been exchanged for performance by the other party. Among other situations, the failure may arise from the wilful breach of the promise. ▪ And in a bilateral contract, such failure of consideration is a defense to an action for a breach of the contract inasmuch as it is contemplated that the performance of the unilateral promises shall be in exchange for each other, the performance being considered as equivalent in value. It is said in *Bray* v. *Lowery,* 163 Cal. 256, 260 [124

P. 1004] : ''This case therefore comes within the rule stated in *Richter* v. *Union Land & Stock Co.,* 129 Cal. [367] 372 [62 P. 40], as follows: 'In all executory contracts the several obligations of the parties constitute to each, reciprocally, the consideration of the contract; and a failure to perform constitutes a failure of consideration—either partial or total, as the case may be—within the meaning of section 1689 of the Civil Code.' (See, also, *Sterling* v. *Gregory,* 149 Cal. [117], 121 [85 P. 305], and *Cleary* v. *Folger,* 84 Cal. 316 [18 Am.St. Rep. 187, 24 P. 280].)'' (See, also, *Mulborn* v. *Montezuma Imp. Co.,* 69 Cal.App. 621, 628 [232 P. 162] ; Rest., Contracts, § 266 et seq.; Williston on Contracts (rev. ed.), vol. 3, §§ 813-814.) ▮ In the instant case, although there was no express promise in the marketing contract on the part of the corporation to process and market appellants-producers' products nor a fixed time during which the producers agreed to deliver their products to the corporation, we believe it may fairly be implied that the promises in that connection were to run for at least ten years inasmuch as the notes were payable in ten annual installments. It will be noted from the heretofore quoted paragraph from said contract, that in order to assist in the marketing and processing of the products, and in *further consideration* of the payment by the corporation of the premiums on the insurance policies, the notes were given. They were given as an extension of credit to the corporation, implying that the corporation was to continue its activities and maintain the insurance policies in return for the continuation of the extension of credit by the notes which were payable, not in a lump sum, but in ten annual installments. The court found that the notes were executed for the purposes mentioned in the marketing contracts and ''at the same time and as a part of the respective transactions.'' The court also found that from 1927 to 1930 *pursuant to the marketing contracts* appellants delivered their products to the corporation and the corporation *entered credits on its* books as payments on the notes, indicating that the continued operation of the corporation was exchanged for the payment of the promissory notes. A further indication of the reciprocal nature of the promise in the notes and that of the corporation appears from the following clause in the marketing contracts: ''*The release of the Producer from delivering his said products* or any part thereof in accordance with said Manufacturing and Marketing Agreement, or a failure on his part so to

deliver his said products or any part thereof, *shall not release the maker from any portion of his liability under said promissory note."* [Emphasis added.] The producers were obligated on the note even if they violated their agreement to deliver their produce. It necessarily follows that if they did deliver their products and were able and willing to do so in the future, the corporation was under an equal obligation to continue to receive, process and market it as long as the installments on the notes continued to become due.

The breach of the marketing contracts consisted of the failure after 1930 to handle appellants' products and maintain the insurance policies in force arising from the voluntary bankruptcy of the corporation in that year rendering it incapable of further performance. ■ The insolvency of a promisor in a bilateral continuing contract is tantamount to a breach of the contract by him. (*Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94 [142 P.2d 741]; *Central Trust Co.* v. *Chicago Auditorium Assn.,* 240 U.S. 581 [36 S.Ct. 412, 60 L.Ed. 811].)

Plaintiffs urge that the asserted failure of consideration did not occur until after appellants had notice of the transfer of their notes to plaintiffs and thus the failure of consideration is not a defense. ■ The general rule is that an assignee of a chose in action is subject to all equities and defenses existing at or before the notice of the assignment. (Civ. Code, § 1459; Code Civ. Proc., § 368; 3 Cal.Jur. pp. 286-289.) But where there is a failure of consideration under a bilateral contract consisting of a breach by the assignor, such failure is a good defense to an action by the assignee whether it occurred before or after the notice of assignment. It is said: "On the other hand, payment to the assignor or other defenses acquired by the debtor against the assignor after notice of the assignment are invalid, *unless the defense, though acquired after notice, is based on a right of the defendant inherent in the contract by its terms. Thus if payments under an executory contract are assigned, the debtor may set up failure of the assignor to fulfill his part of the contract though such failure occurs after notice of the assignment,* for the assignor cannot give another a larger right than he has himself; . . ." [Emphasis added.] (Williston on Contracts (rev. ed.), vol. 2, § 433.) In *Stern* v. *Sunset Road Oil Co.,* 47 Cal. App. 334 [190 P. 651], the court held that recoupment was available to the debtor against the assignee although the

breach of the contract by the assignor occurred after notice of the assignment. (See, also, *Pacific Rolling Mill Co.* v. *English,* 118 Cal. 123 [50 P. 383]; Rest., Contracts, §§ 161, 167(1), illus. 3.) Plaintiffs refer to the statement in 19 California Jurisprudence page 1002 that: ''[A] failure of consideration in whole or in part after the transfer of an instrument to a bona fide holder is no defense in a suit by such holder, notwithstanding his full knowledge of the original consideration for which the paper was given.'' The cases cited for that proposition (*Flood* v. *Petry,* 165 Cal. 309 [132 P. 256, 46 L.R.A.N.S. 861]; *Bank of Ukiah* v. *Gibson,* 109 Cal. 197 [41 P. 1008]; *Splivallo* v. *Patten,* 38 Cal. 138 [99 Am.Dec. 358]; *Pratt* v. *Dittmer,* 51 Cal.App. 512 [197 P. 365]; *First Nat. Bank* v. *Fickert,* 51 Cal.App. 99 [196 P. 112]) concern situations where a negotiable note given as a part of a contract transaction was transferred before maturity to a bona fide purchaser in the regular course of business. In other words, the transferee was a holder in due course. The court merely held that the knowledge of the transferee that the note was given as consideration for an executory promise in the contract but without notice that the promise had not been performed, was insufficient to destroy his status as a holder in due course. In the instant case, assuming that plaintiffs were not holders in due course because of notice of nonpayment of the installment, the availability of the defense here asserted is not dependent upon actual notice of equities in favor of appellants. The general rule has been repeatedly stated that an assignee of a note who is not a holder in due course takes subject to all defenses that would be available against the assignor, one of such defenses being failure of consideration.

Plaintiffs contend that there was no failure of consideration when the notes were pledged to them. (That, as we have seen, is immaterial.) ▊ And further, that appellants have enjoyed the fruits of the marketing contract with the corporation and hence are estopped to raise the defense of failure of consideration. The failure of consideration was, as above shown, the failure and inability after insolvency of the corporation to continue to accept, process and market appellants' products and maintain the life insurance policies in effect. In this connection the court found: ''That on or about the 21st day of May, 1928, [appellants] became aware of the transfer of their respective notes . . . to plaintiffs, . . . ; that said [corporation] was declared a bankrupt on its volun-

tary petition September 5th, 1930; that during the whole time between said dates, [appellants] continued as members of said corporation and said producers associations [the associations who were stockholders in the corporation] and delivered and marketed their products through said corporation, enjoyed and received the benefits of the insurance on their respective lives, the premiums on which insurance were paid by the corporation; accepted and retained the benefits of the money borrowed from plaintiffs [the $5,000 borrowed by the corporation for which appellants' notes were pledged as security], which money was used in the processing and marketing of the products of [appellants], as above recited, and all other benefits of their membership in and affiliation with said [corporation] and said Growers Associations, but they never at any time repudiated or rescinded or attempted to rescind the said transactions between themselves and said corporation or between said corporations and plaintiffs herein.

". . . That [appellants], by the execution of said . . . Marketing [contract] . . . by the execution of said notes, and by delivering the same to said corporation for the purpose of extending to it their credit in the amount of said notes, thereby enabling said corporation to borrow said $5,000 from plaintiffs; by the receipt of the benefits of life insurance on their respective lives, and the benefits of said loan by plaintiffs to said defendant corporation, and by all other benefits provided in said . . . Marketing [contract]; and by continuing as members of said corporation after the borrowing of said money as aforesaid, and after they had knowledge of the borrowing of said money as aforesaid, and after having knowledge of the transfer of their notes as security therefor, and all of the other matters and things herein found to be true, said [appellants], ratified the acts of said corporation in borrowing said money from plaintiffs, and transferring said notes to plaintiffs as security for its repayment; and they are by their said acts and conduct, and by the benefits they received as herein found, estopped from setting up any defense to this action on the ground of any alleged fraud . . . , or from making any other defense thereto, . . . and that by their said acts and conduct as herein found, said defendants waived any and all rights that they may or might have had to set up any defense to this action on the ground of any alleged fraud practiced by their said agent, California Cooperative Producers, or its agent, or from making any other defenses

thereto, as to the matters hereinabove found.'' We do not find any estoppel or reason springing from the foregoing circumstances which prevent appellants defending on the ground of failure of consideration. The awareness on their part of the pledge of their notes to secure the payment of the $5,000 did not impose upon them any duty with respect to the assignees. They could assume that inasmuch as the assignees had no greater rights then, and were subject to the same defenses as the corporation-assignor, they would govern their acts and protect themselves accordingly. Certainly they continued as members of the associations, which were stockholders in the corporation, and delivered their products to the corporation. They were bound to do that under the marketing and association contracts and were privileged to assume that the corporation would continue its performance and that the plaintiffs-assignees would be subject to the defenses arising from the failure of the corporation-assignor to perform. Appellants did receive the benefits of the marketing contracts prior to insolvency but they were entitled to receive them under those contracts. Plaintiffs cite *Maddock* v. *Russell,* 109 Cal. 417 [42 P. 139], and *Rohrbacher* v. *Kleebauer,* 119 Cal. 260 [51 P. 341], for the proposition that appellants cannot complain because they have enjoyed the fruits of the contracts. Those cases are not in point inasmuch as the contracts here involved are the marketing contracts and there has been a failure of consideration therein as above stated. The corporation has been unable to perform since 1930. Appellants did not rescind the contracts. They had no grounds for doing so insofar as failure of consideration is concerned. There was no failure of consideration until the insolvency of the corporation. Appellants did nothing to mislead plaintiffs. It is not found that they promised to pay the $5,000 the corporation borrowed or to pay to plaintiffs the notes executed by them. Prior to the insolvency they did not waive the defense of failure of consideration. It had not failed as yet and there is nothing to indicate that they did so as to a future possibility of a breach by the corporation.

Running through the above quoted finding of the court is an undercurrent intimating that the corporation was the alter ego of the appellants-producers and the associations to which they belonged; that the insolvency was their act; and, that hence the $5,000 note was really their note. The court also found that the corporation ''was in effect owned by

said 'Producers Associations' composed of the fruit growers, the latter constituting the membership of the 'Producers Association,' and these fruit growers were also directly connected with the California Cooperative Producers by the Financing, Manufacturing and Marketing agreement executed by each of them.'' And that ''said corporation and its officers were agents of [appellants] in the marketing of their products.'' We see no basis for disregarding the corporate entity. It was not a nonstock, nonprofit cooperative corporation. It was one in which persons other than stockholders could share in the profits. Accepting the agency relationship the marketing contracts were still binding and the corporation-agent was obligated to perform thereunder. The borrowing of the $5,000 by the corporation from plaintiffs was on its own liability, not on that of the members. If that were not so, we would be disregarding the corporate entity, and the action would have been on the $5,000 note rather than the pledged notes. The corporation was the agent of appellants in the sense that it was a processing and marketing agent for the producers. It is true that appellant Galbreath became a director of the corporation after the $5,000 note was given and appellants' notes were pledged but that still does not prevent him from asserting failure of consideration under a contract he had with the corporation. It was still a corporate entity. There is no finding that the voluntary bankruptcy of the corporation was not in good faith. As far as appears. no other course was open. Indeed on the subject of disregarding the corporate entity, plaintiffs state in their brief: ''Plaintiffs have not at any time contended that the Cooperative was in law the alter ego of Appellants.

''It should also be borne in mind that this is not an action to enforce shareholders' liability, although a number of the statements in the opening brief might lead the casual reader to so believe. As appellants have stated, it had already been decided that the shareholders were liable on the Corporation note here involved; but they have not met that obligation. This is an action upon promissory notes executed by Appellants to the California Cooperative Producers and by that organization pledged to the Plaintiffs and Respondents. By reason of the nature of the defenses interposed by the Defendants, it has become necessary to show that they were so closely related to the Cooperative that they cannot escape liability on those notes by the defenses relied upon.''

It will be recalled that as to appellant Winchester judgment was given for the face amount of the note including the first installment. Inasmuch as it is now conceded by plaintiffs that this appellant was entitled to a credit for the amount of that installment that portion of the judgment cannot stand. As to the other appellants the statute of limitation was found to have run on the first installment of each of said notes.

The judgment is reversed and the case may be retried only upon the issue of notice of nonpayment of the first installment at the time of the transfer, and judgment may thereafter be entered in accordance with the views expressed herein in the light of the determination of the issue of notice.

Gibson, C. J., Shenk, J., Schauer, J., and Spence, J., concurred.

TRAYNOR, J.—I dissent.

In my opinion it is unnecessary to remand this case to the trial court for a finding on the question of notice, since the findings and the evidence show that plaintiffs took the notes without notice that the first installments had not been paid. Moreover, I do not understand by what reasoning my associates reach the conclusion that despite a finding that the transferee of an installment note acted in good faith and the fact that an inquiry would have revealed no defenses he cannot as a matter of law be a holder in due course if he acquires the note with notice of the nonpayment of a past due installment.

The first question to determine is whether the first installments were due and unpaid at the time the notes were pledged. There is confusion in the findings as to whether under the marketing agreement, payment was made upon defendants' delivering fruit of enough value to meet each installment as it became due or upon the payee's deducting the amount of each installment from the proceeds from the sale of the fruit. The trial court found that the payee had in its possession on the due date of the first installments, money and property or credits of defendants "sufficient in value or amount to pay, satisfy and discharge the amount of said First installment payment of each of said respective promissory notes in full." The money, property, or credits referred to consisted of fruit as well as proceeds from the sale thereof. There was evidence that the proceeds alone would not cover the first installments on the due date thereof. It may be assumed for the purpose

of this opinion, therefore, that the first installments were unpaid when the notes were pledged. The question then arises whether plaintiffs are holders in due course.

A holder in due course is defined in section 3133 of the Civil Code (N.I.L., § 52) as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"(1) That it is complete and regular upon its face;

"(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"(3) That he took it in good faith and for value;

"(4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

No question is raised with respect to subdivisions (1) and (3). Any conclusion that plaintiffs are not holders in due course must therefore be based on subdivision (2) or (4).

The first major issue presented under these subdivisions is whether plaintiffs were precluded from being holders in due course merely because the maturity date of the first installments had passed before they acquired the notes.

Subdivision (2) specifies two conditions: The holder must have taken the instrument (a) before it was overdue and (b) without notice that it had been "previously dishonored, if such was the fact."

*Is an installment note overdue in its entirety when it is transferred after the due date of an installment?* An installment note is of course overdue as to installments due before the date of transfer, and, under subdivision (2), a transferee thereof cannot be a holder in due course as to such installments. In the absence of the operation of an acceleration clause, however, the fact that the maturity date of one or more installments has passed cannot make the instrument overdue as to installments payable in the future. The instrument is in part overdue and in part not. Is it overdue within the meaning of subdivision (2)? An instrument is not overdue until the specified maturity of the principal obligation. An installment note, however, has several maturities, and if the maturity of each installment is regarded as the maturity of the instrument, then the instrument would be overdue after the maturity of the first installment. (See 40 Harv.L.Rev. 634, 636.) This interpretation would make the instrument

all black or white. The more realistic interpretation, and the one in accord with the expressed intention of the Uniform Negotiable Instruments Act to make installment notes negotiable (Civ. Code, § 3083, N.I.L., § 2), would be that the instrument, like the principal obligation, is overdue only as to matured installments, but not as to installments payable in the future. A contrary holding would render installment notes nonnegotiable after the due date of the first installment. Even if a transferee could thereafter be a holder in due course if that or subsequent installments were paid, he would still have to ascertain at his peril whether the previous installments had been paid. Thus the privilege of a holder of a negotiable instrument to be free from a duty to inquire into the relations between previous parties to the instrument would be denied the holder of an instrument payable in installments.

*Is a transferee who has acquired the note after an installment has matured, without notice of its nonpayment, a purchaser with notice that the note has been previously dishonored?* Even if it is assumed that the nonpayment of one or more installments is tantamount to dishonor of the whole instrument, the holder has no notice of dishonor unless he has notice of nonpayment. Circulation of the instrument after the due date of an installment except the last cannot serve as notice that the installment has not been paid, for the instrument was designed to circulate until the maturity date of the last installment. A transferee has no reason to conclude from the mere fact that the note circulates after the due date of one or more installments that such installments were not paid: He may assume that the ordinary course of business has been followed and that the installments have been paid. (Code Civ. Proc., § 1963(20).) Nor need the transferee of such an instrument find a dated receipt on the note for each installment paid. The Uniform Negotiable Instruments Act does not provide for such notations, and in any event they could be placed on the instrument by the transferor even though the installment had not in fact been paid.

*Does subdivision (4) of section 3133 preclude a transferee's being a holder in due course when he has no notice of the fact that an installment was not paid when due?* Since the transferee may assume that the matured installments have been paid, and since he has no notice from the note itself of the nonpayment of past installments merely because the note is

transferred after the due date thereof, a fortiori he has no notice from that fact alone of any infirmity in the instrument or defect in the title of the person negotiating it. "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." (Civ. Code, § 3137; N.I.L., § 56.) It follows that neither subdivision (2) nor subdivision (4) precludes a purchaser of an installment note from being a holder in due course merely because he purchased the same after the due date of one or more installments.

We turn, therefore, to the second major issue in this case, namely, whether a purchaser can be a holder in due course as to unmatured installments if he has taken the note with knowledge that one or more installments were not paid when due. The majority opinion concludes that such a purchaser cannot be a holder in due course but does not explain upon what provision of the Uniform Negotiable Instruments Act its conclusion is based. It is necessary therefore to reexamine the pertinent provisions of that act to determine whether they afford any justification for that conclusion.

*Does notice of the fact that an installment note is transferred after an installment has matured and is unpaid make the whole note overdue within the meaning of subdivision (2) of section 3133 of the Civil Code (N.I.L., § 52)?* The act makes no provision for notice that a note is overdue. It provides merely that a holder in due course must acquire the note "before it was overdue." When the instrument provides the date of maturity on its face, notice from other sources is irrelevant. (See Britton, Bills and Notes, 498.) It has already been observed that a holder cannot be a holder in due course as to installments that were overdue when he acquired the note, but that he can be a holder in due course as to future installments, which are not overdue unless their maturity dates have been accelerated. There is nothing in the statute providing as a matter of law for the acceleration of an installment note on the nonpayment of any installment. The only provision of subdivision (2) that depends on notice for its operation is the requirement that the transferee, to be a holder in due course, must acquire the note "without notice that it had been previously dishonored, if such was the fact."

*Does notice of the nonpayment of an installment constitute notice of dishonor of the entire note?* Section 3164 of the Civil Code (N.I.L., § 83) provides: "The instrument is dishonored by nonpayment when—(1) It is duly presented for payment and payment is refused or cannot be obtained; or (2) Presentment is excused and the instrument is overdue and unpaid." Presentment was waived on the notes involved in this case and therefore the instruments were dishonored as to the first installments if they were overdue and unpaid. It does not follow, however, that the instruments were dishonored in their entirety. Since an installment note can be overdue and unpaid as to certain installments, but not overdue and unpaid as to others, it can likewise be dishonored by nonpayment as to certain installments, but still not be dishonored as to others.

If dishonor by nonpayment of an installment when due is tantamount to dishonor of the instrument as to future installments, it would follow that even if that installment were subsequently paid, the whole note would be regarded as "previously dishonored." Consequently, knowledge of a transferee that one installment was paid late would preclude his being a holder in due course as to future installments, for he would have notice that the instrument was "previously dishonored." It is settled, however, under the provisions of the Uniform Negotiable Instruments Act with respect to notice of dishonor to persons secondarily liable, that dishonor of an installment does not constitute dishonor of the note as to other installments. Section 3170 of the Civil Code (N.I.L., § 89) provides that "when a negotiable instrument has been dishonored by nonacceptance or nonpayment, notice of dishonor must be given to the drawer and to each endorser, and any drawer and endorser to whom such notice is not given is discharged." If dishonor of the instrument as to one installment constituted dishonor of the instrument as to all installments, failure of the holder to give notice of dishonor within the period prescribed as to one installment would deprive him of the right to recover from the persons secondarily liable, when subsequent installments were dishonored. It is established, however, that even though the holder has failed to give proper notice of dishonor as to an installment, he is not prevented from giving such notice as to subsequent installments that are not paid at their maturity dates. (*Berkowitz* v. *Kasparewicz*, 121 Conn. 140, 145 [183

A. 693, 104 A.L.R. 1326]; *Warneke* v. *Preissner*, 103 Conn. 503, 507 [131 A. 25]; *Roberts* v. *International Bank*, 25 F.2d 214, 216; *Chamberlain* v. *Cobb*, 129 Wash. 549, 551 [225 P. 414]; see 10 C.J.S. 896; Uniform Laws Annotated, Negotiable Instruments, n. 13 to § 89.)

An analogy is presented by the cases involving nonpayment of one of a series of notes. According to the cases decided under the Uniform Negotiable Instruments Act, knowledge of the dishonor of one of the notes does not constitute notice that all of the notes of the series are dishonored. (*Hobart M. Cable Co.* v. *Bruce*, 135 Okla. 170, 171 [274 P. 665, 64 A.L.R. 451]; *Morgan* v. *Farmington Coal & Coke Co.*, 97 W.Va. 83, 99 [124 S.E. 591]; Brannan, Negotiable Instruments 566; *cf.*, however, 64 A.L.R. 457, 458 (collection of cases decided under common law principles).)

The conclusion seems inescapable therefore that if knowledge of nonpayment of a past due installment precludes a purchaser from being a holder in due course as to unmatured installments, it is not because of the provisions of subdivision (2) of Civil Code section 3133 (N.I.L., § 52(2).) It remains only to determine whether such a result is justified by the provisions of subdivision (4).

*Is notice of the nonpayment of an installment, as a matter of law, notice of "any infirmity in the instrument or defect in the title of the person negotiating" the note within the meaning of subdivision (4) of Civil Code section 3133 (N.I.L., § 52(4))?* Section 3137 of the Civil Code (N.I.L., § 56) provides, "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Knowledge that an installment has not been paid when due is clearly not actual knowledge of an infirmity in the instrument itself or of a defect in the title of the person negotiating it. To prevent the transferee from becoming a holder in due course, such knowledge must therefore be knowledge of such facts that his action in taking the instrument amounted to bad faith.

Under subdivision (4) of Civil Code, section 3133 (N.I.L., § 52(4)), therefore, if an installment is not paid when due, notice of that fact does not, as a matter of law, preclude the transferee from being a holder in due course. Such notice is

at most evidence of bad faith to be weighed by the trier of facts with the other facts to determine whether the transferee took the note in question in good faith. Even if it be assumed that such knowledge would be sufficient to put a prudent man on inquiry to determine if the note was subject to defenses, the transferee is not thereby deemed to have acquired the note in bad faith, for negligence is not a bar to recovery on a negotiable instrument. Civil Code, section 3137 (N.I.L., § 56) clearly makes the good or bad faith of the transferee the only test. In construing this provision, this court has followed the general rule "that mere knowledge of facts sufficient to put a prudent man on inquiry, without actual knowledge, or mere suspicion of an infirmity or defect of title, does not preclude the transferee from occupying the position of a holder in due course, unless the circumstances or suspicions are so cogent and obvious that to remain passive would amount to bad faith." (*Popp* v. *Exchange Bank,* 189 Cal. 296, 303 [208 P. 113] ; *Goodale* v. *Thorn,* 199 Cal. 307, 314 [249 P. 11] ; *Merced Security Sav. Bank* v. *Bent Bros.,* 207 Cal. 652, 656 [279 P. 765] ; *Nuckolls* v. *Bank of Calif.,* 10 Cal.2d 278, 284 [74 P.2d 271] ; *Barthelmess* v. *Cavalier,* 2 Cal.App.2d 477, 487 [38 P.2d 484] ; *Imperial Gypsum & Oil Co.* v. *Chaplin,* 4 Cal.App.2d 109, 113 [40 P.2d 596] ; see 5 Uniform Laws Annotated, Negotiable Instruments, n. 31-136 to § 56; Brannan, Negotiable Instruments, 6th ed., 636-641; Rightmire, Bad Faith in Negotiable Paper, 18 Mich.L.Rev. 355, 367-368; Britton, Bills and Notes, 411-415; 81 U. of Pa.L.Rev. 617.) "Under the statute, section 56, . . . a purchaser is not chargeable with notice of an infirmity or defect in the instrument unless he had 'actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.' The statute by its terms excludes constructive notice." (*Allen* v. *Cooling,* 161 Minn. 10, 15 [200 N.W. 849].)

The mere fact that one or more installments of an installment note are unpaid when the note is negotiated does not convey knowledge to the transferee of a defense against the note; nor does it reveal such knowledge of circumstances that it can be said that the holder of the note shut his eyes to the facts and in bad faith sought to avoid the knowledge of a defense. In that respect there is no difference between a transferee of a negotiable instrument with knowledge that one or

more installments of interest are unpaid and a transferee with knowledge that one or more installments of principal are unpaid. Before the adoption of the Uniform Negotiable Instruments Act there was a conflict of authority with regard to the effect of the late payment of an installment of interest. Under the Uniform Act, however, the rule is now generally recognized to be that "knowledge that interest is due and unpaid does not, of itself constitute bad faith, but such fact may be taken into consideration by the jury along with other facts on the issue of purchase in good faith." (Britton, Bills and Notes, 456-457; *City of New Port Richey* v. *Fidelity & Deposit Co.*, 105 F.2d 348, 352.)

Similarly, notice of a default in the payment of an installment of principal disconnected from other facts does not prevent the transferee from being a holder in due course. Nor does such notice alone constitute bad faith and put the holder under a duty to make an inquiry. Even if good faith would require the transferee to make an inquiry, it would not necessarily follow that he could not still be a holder in due course. The inquiry may reveal that the default is fully explained by the circumstances and that it constitutes no warning that the maker has a defense with regard to installments to mature in the future. Thus, it may appear that prompt payment has been waived and that the delay with regard to one or more past due installments does not exceed the delay in the payment of other installments that have been paid late in the past. Failure to pay a past due installment may arise from unexpected circumstances affecting the ability of a maker to pay rather than from an equitable defense. Many installment notes containing an acceleration clause provide that the holder can accelerate future installments only if one or more past installments remain unpaid for a specified period. In such cases installments are frequently paid in the interval between the maturity date of the installment and the date at which under the terms of the note the holder would be entitled to accelerate future payments. A rule would be contrary to common experience that held in each case in which a past due installment is unpaid, notice of such fact alone is notice that the maker has a defense against future installments payable under the note.

In my opinion, therefore, the rule set forth in the majority opinion that a purchaser of an installment note who has knowledge that a past due installment was unpaid when he acquired

the note "is put on inquiry that there may be some defenses against it and . . . cannot be a holder in due course" cannot be reconciled with the provisions of the Uniform Negotiable Instruments Act. The cases cited for this proposition include only three cases decided under the Uniform Negotiable Instruments Act. Of these three cases, only one actually held that the late payment of an installment precludes a subsequent purchaser from being a holder in due course. (*Hibbard* v. *Collins*, 127 Me. 383, 386 [143 A. 600].) That case in fact held that notice was immaterial, apparently on the theory that when the first installment was overdue the whole note was overdue. (See Brannan, Negotiable Instruments, 566.) Obviously, the majority opinion in the present case is not based on the theory that the note was overdue as to all installments, for the question whether plaintiffs are holders in due course is held to turn on whether or not they had notice of the non-payment of an installment. In *City of New Port Richey* v. *Fidelity & Deposit Co.*, 105 F.2d 348, 352, there is a dictum to the effect that notice of the nonpayment of an installment prevents a subsequent purchaser from being a holder in due course. The actual holding of that case, however, is that "known non-payment of interest, though not in law notice of dishonor, is a fact to be considered with all other circumstances on the question of the bona fides of the taking." The majority opinion places great reliance on a statement in *United States* v. *Capen*, 55 F.Supp. 81, 83, but the actual decision in that case turned on a rule adopted in some jurisdictions that where an installment note contains an automatic acceleration clause and the maker fails to pay the first installment, the whole note is automatically overdue. (Cf., however, *Andrews* v. *Zook*, 125 Cal.App. 19, 22 [13 P.2d 518]; *Sullivan* v. *Shannon*, 25 Cal.App.2d 422, 425 [77 P.2d 498].)

The cases decided under common law principles, the one case deciding the question under the Uniform Negotiable Instruments Act, and the dicta in the other cases relied on in the majority opinion, are all based on the theory that the transferee was a purchaser of overdue paper or was a purchaser with notice of dishonor. (See Britton, Bills and Notes, 455.) It has already been observed that there is no support for either theory in the provisions of the Uniform Negotiable Instruments Act. The majority opinion cannot be brought within the purview of that act unless it is regarded as hold-

ing that as a matter of law anyone who purchases an installment note with knowledge that an installment is unpaid is a purchaser in bad faith. But even then it cannot be reconciled with the act, as is well illustrated by the facts of the present case.

Plaintiffs gave a loan of $5,000 to a corporation in which they had no interest and with which they had no other business connections. Even if they knew that the first installments had not been paid and good faith required an inquiry when the notes were pledged, such an inquiry could not have revealed the defense of subsequent failure of consideration now set up to bar their recovery on the notes. Plaintiffs could not learn in advance that years later the corporation would become insolvent and be unable to perform its obligations under its contract with the makers. The rule adopted by the majority of this court actually empowers the maker of an installment note to render the note nonnegotiable by refusing to pay an installment, for knowledge of that fact precludes a transferee's being a holder in due course. Such a rule contradicts the basic principle of the statute that a transferee of a negotiable instrument is not required, except by considerations of honesty and good faith, to enter upon on inquiry with regard to transactions that have given rise to the issuance of the instrument.

If the principles set forth in the Uniform Negotiable Instruments Act are applied to this case, knowledge that the first installments were not paid would not as a matter of law prevent plaintiffs from being holders in due course. It would merely be evidence that plaintiffs might not have acquired the notes in good faith. Good faith may require a transferee to make an inquiry on the basis of such knowledge depending on the facts of the particular case. What constitutes good faith is essentially a question of fact and depends on the circumstances in each case. For example, if the purchaser knew that one or more of the installments were not paid on the due date and made a reasonable inquiry that revealed only that the payments had not been made because of some reason unconnected with any defense, he should not be barred from recovery on the note merely because of subsequent failure of consideration, a defense that could not have been known at the time. On the other hand, if the purchaser acquired the note with knowledge that several installments had not been paid, it would appear that he failed to act in good faith if he failed

to make an inquiry, unless the surrounding circumstances showed that this failure was attributable to negligence and not to dishonesty. Such questions, however, are questions of fact for the trial court or jury and should only be considered matters of law when the facts are not in conflict and not reasonably suspectible of conflicting inferences.

Under the holding of the majority opinion, the negotiability of installment notes has been seriously impaired. After any installment has matured, it is unsafe for a purchaser, even though he acts in good faith, to acquire such a note without making certain that all past due installments have been paid. His rights as a holder in due course may be questioned at some future date by the maker's merely asserting that an installment was unpaid at the time of the transfer and that the transferee had knowledge of that fact. In such a situation, if the maker had a defense that involves the title of the payee, the holder would have the burden of showing that either the installment was paid when due or that he had no notice of that fact. (Civ. Code, § 3140; N.I.L., § 59.) In view of the power and responsibility of the trier of facts under decisions of this court (see *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]) there is always the risk that the evidence might be held susceptible of an inference that the holder had notice of the nonpayment of a past due installment.

Even under the rule of law announced in the majority opinion, it is unnecessary to remand this case to the trial court on the question of notice.

The trial court found ''That the first installment of each of the said notes given to plaintiff as security for the note of said California Producers were past due on its face at the time of the transfer of said notes to plaintiffs, and that plaintiffs are not holders in due course of said collateral notes; but the court also finds that said plaintiffs were purchasers and *holders* of said notes *in good faith and for value* and without notice of any equity or defense of defendants or any of them. . . .'' (Italics added.) It was the position of the defendants at the trial that the notice of nonpayment of the first installments was irrelevant since the date for the payment thereof had passed before the notes were transferred to plaintiffs. Under the principles already discussed, the effect of notice of nonpayment of a prior installment is pertinent only to the question whether or not the purchaser acquired the note in good faith. Since there was no evidence that

plaintiffs were not holders in due course, except in regard to the first installments, it is obvious that the "finding" that plaintiffs were not holders in due course is based upon defendants' theory and is an erroneous conclusion of law.

Since the trial court found that plaintiffs were holders of the notes in question "in good faith and for value without notice of an equity or defense of defendants," it follows that the plaintiffs are holders in due course. This finding on its face, under the foregoing principles of law, can mean only one of two things: (1) plaintiffs purchased the notes without knowledge that the first installments were unpaid, or (2) even if the first installments were not paid when due and plaintiffs had knowledge of that fact, under the circumstances of the case, plaintiffs were none the less acting in good faith when they acquired the notes. Since either question is one of good faith, if either theory is supported by the evidence, the judgment must be affirmed, except to the extent that it allows plaintiffs to recover against defendant Winchester for the first installment of her note. This installment was either paid before the transfer of the note or was subject to defenses. Since it was overdue, plaintiffs were not holders in due course as to it.

Even if it is assumed that under the facts of the present case the trial court would not have found that plaintiffs were purchasers in good faith if it believed that the plaintiffs had notice of the nonpayment of the first installment, the reasonable construction of the finding in regard to the good faith of plaintiffs is that they acquired the notes without such notice.

A holder of a negotiable instrument is "deemed prima facie a holder in due course . . ." (Civ. Code, § 3140, N.I.L., § 59), and a person who acquires an installment note after an installment is due is entitled to rely on the presumption that the due course of business has been followed. (Code Civ. Proc., § 1963.) Since it is an established principle that all inferences and presumptions must be applied to support the judgment of the court, the trial court's finding that the plaintiffs acquired the notes in question as "purchasers and holders of said notes in good faith and for value and without notice of any equity or defense of defendants . . ." must be construed as a finding that the notes were acquired without notice of nonpayment of the first installments.

The remaining question is whether this construction of the finding is supported by the evidence. The principal plaintiff testified that he knew nothing of the status of the pledged

notes and that he relied on the recommendation of a Mr. Anderson, the president of a bank that later acted as plaintiffs' agent in delivering the notes. Plaintiff testified that Mr. Anderson told him that the notes would be secured by growers' notes but that Mr. Anderson did not tell him of the nature of the growers' notes.

Defendants introduced no evidence sufficient to controvert this testimony. Mr. Anderson was called as defendants' witness but he was able to state only that he advised one of the plaintiffs that the corporation would use the money to start a cannery in Sacramento and that it would be advantageous to the city and to this plaintiff. Mr. Anderson testified that he could not recall whether at that time he knew anything about the status of the growers' notes. The testimony of this witness was struck from the record as irrelevant. Defendants contend that the testimony was admissible to show that the witness knew of the status of the notes and that he was plaintiffs' agent. The only agency shown, however, was that the witness's bank was subsequently the agent for the delivery of the notes and none of the testimony struck tended to show that plaintiffs had any knowledge of the nonpayment or of any defense available to defendants at that time.

It is contended that an inference that plaintiffs had notice that the first installment was overdue could be drawn from the fact that the $5,000 note from the California Cooperative Producers contained a list of the installment notes transferred to plaintiffs as security, because this list designated.the full face amount of each of the pledged notes. It is evident on the face of the principal note, however, that the full amounts were listed for purposes of identification. It was necessary to give the full face amount of each note, since the principal note executed by the corporation, after enumerating the notes given as security, stated, ''The maker hereof may, while not in default, substitute as security hereunder, in place of any of said note or notes, note or notes of its grower members, of equal amount, form and character.'' Even if the trial court could have reasonably inferred from the listing of the notes with their full amounts that plaintiffs had knowledge of the nonpayment of the first installments, it was free to draw or not to draw such an inference.

Edmonds, J., concurred.