Filed 6/17/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE SUPERIOR COURT OF ALAMEDA COUNTY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF ALAMEDA et al., <br><br> Defendants and Respondents. | H048342 <br> (Alameda County <br> Super. Ct. No. RG19041329) |

Plaintiff Alameda County Superior Court (ACSC) challenges the trial court's determination that a three-year memorandum of understanding (MOU) between ACSC and defendants County of Alameda (the County) and Alameda County Sheriff's Office (the Sheriff) governing court security services does not obligate the Sheriff to provide a minimum level of court security services of 129 "FTEs" (full time equivalents) after the expiration of the MOU. The trial court ruled that the MOU entitled the County and the Sheriff to unilaterally reduce court security services provided by the Sheriff to ACSC below 129 FTEs if funding provided to the County by the State of California (the State) for court security services was not sufficient to pay for 129 FTEs.

The trial court's decision turned on its conclusion that exhibit C-3 of the MOU permitted the Sheriff to reduce court security services provided during the last six months of the three-year period covered by the MOU and that exhibit C-3 was the "deployment schedule" that remained in force under the MOU after the MOU's expiration until the parties agreed on a new MOU. ACSC argued in the trial court that exhibit C-1, the deployment schedule that governed the level of court security during the first two years

of the period covered by the MOU and which required a minimum of 129 FTEs, was the only deployment schedule in the MOU, and therefore it was exhibit C-1 that remained in force after the expiration of the MOU.

On appeal, ACSC reiterates the argument it made in the trial court. We conclude that exhibit C-1's provisions concerning the level of court security services remained in force after the expiration of the MOU because exhibit C-1 is the only portion of the MOU that meets the requirement of Government Code section 69926[1] that a court security MOU specify an "agreed-upon level" of court security services. We find that exhibit C-3 did not satisfy that requirement. Consequently, we reverse the trial court's decision and remand for further proceedings.

## I.      THE HISTORY OF TRIAL COURT SECURITY FUNDING

Trial courts were historically funded by counties, which meant that counties were responsible for funding trial court security. In 1997, the Legislature enacted the Lockyer-Isenberg Trial Court Funding Act of 1997 (the 1997 Act), § 77200 et seq., because "the counties of California are no longer able to provide unlimited funding increases to the judiciary and, in some counties, financial difficulties and strain threaten the quality and timeliness of justice." (Stats. 1997, ch. 850, §§ 1, 2(f).) The 1997 Act was intended to ensure that "county contributions to trial court operations shall be permanently capped at the same dollar amount as that county provided to court operations in the 1994-95 fiscal year with adjustments to the cap, as specified." (*Id.*, § 3(b).) In the 1994-1995 fiscal year, the State funded 65 percent of trial court operations. (Stats. 1994, ch. 308, §§ 1(b), 15; former § 77200; Stats. 1992, ch. 163, § 90; former § 77003.) Thus, although the 1997 Act was intended to lead to a "transfer [of] all fiscal responsibility for the support of the trial courts from the counties to the State of

_____

[1] All further statutory references are to the Government Code unless otherwise indicated.

2

California" (§ 77212), it did not effectuate full funding of trial courts by the State. The 1997 Act created a Trial Court Operations Fund in each county into which the State would deposit funds for trial court operations, which included court security services. (Stats. 1997, ch. 850, §§ 43, 44.) Courts were responsible for deciding how to allocate these funds. (Stats. 1997, ch. 850, § 44; § 77009, subd. (b).) In 1998, the Legislature enacted former section 77212.5, which required most trial courts to contract with sheriff's departments for court security services, with the costs of those services billed to the courts by the counties. (Stats. 1998, ch. 764, § 1; §§ 77003, subd. (a)(3), 77009, subd. (g)(7).)

In 2002, the Legislature enacted the Superior Court Law Enforcement Act of 2002 (the 2002 Act), which repealed former section 77212.5 and directed superior courts to "contract, subject to available funding, with a sheriff or marshal, for the necessary level of law enforcement services in the courts." (Stats. 2002, ch. 1010, § 1; former §§ 69920, 69921.5.) The sheriff and the court were required to "develop an annual or multiyear comprehensive court security plan that includes the mutually agreed upon law enforcement security plan to be utilized by the court." (Stats. 2002, ch. 1010, § 1; former § 69925.) They were required to enter into an MOU "specifying the agreed upon level of court security services, cost of services, and terms of payment." (Stats. 2002, ch. 1010, § 1; former § 69926, subd. (b).)

The 2002 Act was not intended to "increase or decrease the responsibility of a county for the cost of court operations . . . for court security services . . . . Any new court security costs permitted by this article shall not be operative unless the funding is provided by the Legislature." (Stats. 2002, ch. 1010, § 1; former § 69927, subd. (a).) "Nothing in this article may increase a county's obligation or require any county to assume the responsibility for a cost of" court security services. (Stats. 2002, ch. 1010, § 1; former § 69927, subd. (b).)

In 2011, the Legislature enacted a "realignment" of court funding.  One of the purposes of the 2011 realignment was to "transfer the funding of court security to the counties" and "allow courts and counties to come to reasonable local agreements regarding the costs of court security," which was necessary because the State "has no control over what level (and cost) of deputy is assigned to the court."  "[F]unding for the provision of court security [would go] directly to local sheriff's offices rather than being appropriated in the annual state budget to the trial courts."  Under the 2011 realignment law, each county was required to create a Trial Court Security Account into which the State would deposit funds on a monthly basis that "shall be used exclusively to fund trial court security provided by county sheriffs."  (Stats. 2011, ch. 40, § 3; former §§ 30025, subd. (f)(3), 30027, subd. (c)(1).)

In 2012, the Legislature enacted the Superior Court Security Act of 2012 (the 2012 Act).  (§ 69920 et seq.; Stats. 2012, ch. 41, § 27.)  Similar to the 2002 Act, the 2012 Act required the sheriff and the court to "develop an annual or multiyear comprehensive court security plan that includes the mutually agreed upon law enforcement security plan to be utilized by the court."  (§ 69925.)  And, like the 2002 Act, the 2012 Act mandated an "annual or multiyear memorandum of understanding" between the court and the sheriff "specifying an agreed-upon level of court security services . . . ."  (§ 69926, subd. (b).)  The 2012 Act also provided that "[t]he terms of a memorandum of understanding shall remain in effect, to the extent consistent with this article, and the sheriff shall continue to provide court security as required by this article, until the parties enter into a new memorandum of understanding."  (§ 69926, subd. (f).)

The 2012 Act changed the funding mechanism for court security services.  It expressly stated that "[a]lthough realignment changed the source of funding for court security, this article is not intended to, nor should it, result in reduced court security service delivery, increased obligations on sheriffs or counties, or other significant programmatic changes that would not otherwise have occurred absent realignment."

4

(§ 69920.)  The 2012 Act provided that "the sheriff is responsible for the necessary level of court security services, as established by the [MOU]" (§ 69921.5), and it prohibited[2] superior courts from paying sheriffs for court security services (§ 69923, subd. (a)).  The 2012 Act provided that the State would deposit funds into the "Trial Court Security Account" and "the Trial Court Security Subaccount . . . [, which] shall be used exclusively to fund trial court security provided by county sheriffs."  (§ 30025, subd. (f)(10).)

The 2012 Act made special provisions concerning court security services for new courthouses:  "Funding for increased trial court security costs [due to court construction projects with an occupancy date on or after October 9, 2011] shall be funded by the General Fund, subject to an annual appropriation by the Legislature."  (§ 69927, subd. (a).)  For those new courthouses, a county "may request funding" from the State's Department of Finance, which would evaluate such a request on a "case-by-case basis . . . ."  (§ 69927, subd. (d).)  The "Director of Finance" was granted discretion to "limit the amount of funding" provided.  (§ 69927, subd. (f).)

## II.    THE 2015 MOU

In July 2015, ACSC, the County, and the Sheriff entered into an MOU, which recited that it was statutorily required to "specif[y] the agreed upon level of court security services."[3]  The 2015 MOU, which covered the three-year period retroactively beginning on July 1, 2014, provided that it "shall remain in effect for a period of three (3) years, or

---

[2] There was a narrow exception, not applicable here.  "Subject to the memorandum of understanding described in subdivision (b) of [s]ection 69926, the court may pay for court security service delivery or other significant programmatic changes that would not otherwise have been required absent the realignment of superior court security funding enacted in Assembly Bill 118 (Chapter 40 of the Statutes of 2011), in which the Trial Court Security Account was established in [s]ection 30025 to fund court security."  (§ 69923, subd. (b).)  Such services are not at issue here.

[3] The 2015 MOU replaced the parties' 2006 MOU.  The 2006 MOU is not in the appellate record.

5

until amended or terminated . . . ."  Section 1(B) of the MOU provided:  "If the MOU expires before the Parties have executed a new MOU, this MOU shall continue until a new MOU is in place."

Section 2(A) defined "Baseline Services":  "Baseline Services means the court security services set forth in California Government Code section 69922[, subdivision] (b)(l)-(6), including all necessary equipment and supplies."[4]  Section 4(A)(1) provided:  "Subject to the terms of this MOU, Sheriff will provide the Baseline Services as set forth in Exhibits A, C-1, C-2, and C-3.  The scope, level of and deployment schedule for Baseline Services set forth in Exhibits A, C-1, C-2, and C-3 represents the minimum staffing necessary for adequate court security under the operating court conditions and business practices existing upon the execution of this MOU.  The funding for the Baseline Services will be provided directly by the State of California pursuant to Section 30025.  The Court will not be financially responsible for the Baseline Services.  Baseline Services shall not increase beyond the levels established in Exhibits A, C-1, C-2, and C-3 absent a fully executed amendment to this MOU."

Section 4(A)(2) provided:  "The Parties agree to meet and confer to amend this MOU no later than 12 months prior to Sheriff being required to provide any security services at the new courthouse to be located in Dublin, CA (East County Hall of Justice, 'ECHOJ'), but in no event later than August 18, 2016, to address the reallocation of Court Security Section personnel among County courthouses to be in operation at that

---

[4] Section 69922, subdivision (b) provides:  "[T]he court security services provided by the sheriff may include, but shall not be limited to, all of the following:  [¶]  (1) Bailiff functions, as defined in [s]ections 830.1 and 830.36 of the Penal Code, in criminal and noncriminal actions, including, but not limited to, attending court.  [¶]  (2) Taking charge of a jury, as provided in [s]ections 613 and 614 of the Code of Civil Procedure.  [¶] (3) Patrolling hallways and other areas within court facilities.  [¶]  (4) Overseeing and escorting prisoners in holding cells within court facilities.  [¶]  (5) Providing security screening within court facilities.  [¶]  (6) Providing enhanced security for judicial officers and court personnel."  (§ 69922, subd. (b).)

6

time.  Should such amendment not occur prior to the date Sheriff is first required to provide security services at the ECHOJ, the parties agree that Baseline and Additional Services shall be provided as described in Exhibit C-3."

Section 4(D) required the Sheriff to inform ACSC every January of the amount of funds provided by the state and spent for baseline services.  By April of each year, the Sheriff was required to provide ACSC with "a proposed Exhibit C-1 (Baseline Services Deployment Schedule) and Exhibit C-2 (Budget) for the next fiscal year based on the current fiscal year budget and any estimated increase in costs based on salary, employees [*sic*] benefits, and other relevant costs."  The Sheriff and ACSC were required to meet, discuss, and agree upon a new deployment schedule and budget.

Exhibit A of the MOU[5] provided:  "The scope and level of Baseline Service[s] . . . for Fiscal Year 2014-2015 and 2015-2016 . . . are specified in this Exhibit A, Exhibit C-1 . . . and Exhibit C-2 . . . .  The preliminary Baseline Service [*sic*] for Fiscal Year 2016-2017 is discussed in Exhibit C-3."  Exhibit A stated that "Sheriff shall deploy personnel according to the staffing level set forth in the Baseline Services Deployment Schedule attached hereto as Exhibit C-1 to this MOU."  Exhibit B identified how much funding the State would be providing to the County for court security for fiscal years 2014-2015 and 2015-2016:  "approximately $23,609,847.00."  Exhibit C-1 set forth specific and detailed staffing needs for each location and contained charts identifying precisely how many Sheriff's employees in each classification were required at each court location.  Exhibit C-2 identified the budgets for those two fiscal years: $23 million for 2014-2015, and $23.5 million for 2015-2016.

---

[5] Exhibit A was entitled "SCOPE AND LEVEL OF BASELINE SERVICES [¶] FISCAL YEARS 2014-2015 AND 2015-2016."  However, the MOU provided that "[h]eadings are for the convenience of the parties and *are not to be used to interpret the MOU*."  (Italics added.)

Exhibit C-3 did not identify the amount of funding that the State would be providing to the County for court security, but it did state that the County's 2016-2017 budget "reflects that approximately $24 million has been allocated for Court security." Because ECHOJ was expected to require court security halfway through the fiscal year, the parties "reserve[d] the right to further modify the final Baseline Services deployment schedule . . . as set forth in section 4(A)(2) of this agreement." Exhibit C-3 provided: "**Prior to the effective date of this preliminary budget and personnel schedule, Sheriff may seek additional funding to pay for any net increase in Baseline Services that results from staffing ECHOJ, as permitted under California Government Code section 69927. As part of this effort, the Court shall strive to support the Sheriff's Office when it seeks additional funding.** [¶] The Sheriff also reserves the right to reduce the number of personnel/scope of services if the California State Legislature fails to provide sufficient funds, and the Parties are either unwilling or unable to agree to meet the difference."

Exhibit C-3 stated that the "preliminary agreed-upon staffing level" for ECHOJ would be 37 positions and that the parties "agree" that the "necessary" staffing "numbers" for ACSC countywide would be 138 positions. However, exhibit C-3 also stated: "The Parties recognize and agree to meet and confer, as set out in Section 4(A)(2) of the MOU, in order to address: the final assignment of judges at courthouses as of the operational date of the ECHOJ courthouse; the final assignment of Deputies and Sheriff's Technicians at courthouses; and to address any additional staffing issues based on the opening of ECHOJ and the closing of other courthouses. The Parties recognize and agree that the county-wide number of Deputies and Technicians noted above can be adjusted based not only on the assignment of judges and the closing of courthouses, but also the amount of funding available. [¶] Nothing herein shall require the Sheriff to provide Baseline Services above and beyond what funding is ultimately issued by the State of California to the County. Should the California State Legislature fail to provide

8

sufficient funds to cover the amount of services needed on a county-wide basis as detailed above, the Sheriff and County (as noted above) reserve the right to reduce the number of personnel/scope of services. Any such reduction shall be done in consultation with the Court, but shall in no way limit the rights set out herein of the Sheriff."

## III. SUBSEQUENT EVENTS

In 2016, the Sheriff submitted a request to the State for over $3 million in additional funding for court security services at ECHOJ. In 2017, the State responded by granting the Sheriff an additional $500,000 per year for court security services. In 2017, the Sheriff informed ACSC that court security staffing would be substantially reduced due to a shortfall in funding from the State. The County and the Sheriff thereafter "unilaterally failed to provide and pay for Baseline Services at the minimum level of service of 129 daily FTE positions" that had been identified in exhibit C-1 of the 2015 MOU as the necessary level of court security services.

When ACSC protested the reduction in court security services, the Sheriff informed ACSC that he had "exceeded his budget for court security . . . and that going forward, he would reduce, by 8 FTEs, the number of personnel available to provide security." In November 2017, the Sheriff informed ACSC that he would provide only 114 FTEs because that was all that the State's funding would support. The Sheriff instructed his staff to reduce court security services so that the cost of those services matched the funding from the State. Those reductions continued thereafter.

In March 2018, the Sheriff proposed a new MOU to cover the period from January 1, 2018 to June 30, 2022. The proposed new MOU was drafted to permit the Sheriff to adjust court security services to match the funding provided by the State. The proposed new MOU's deployment schedule provided for significantly fewer personnel than 129 FTEs.

ACSC questioned these provisions. ACSC took the position that the County was required to "supplement" the State's funding if necessary to "ensure" that ACSC received

9

the 129 FTEs level of court security services. ACSC and the Sheriff agreed that 129 personnel were needed, and they agreed that the State did not provide adequate funding to support 129 personnel. However, the Sheriff and the County took the position that, due to the funding gap, ACSC should alter "court operations" so that ACSC would need fewer court security personnel.

In August 2019, ACSC initiated the statutory procedure (§ 69926, subd. (d)) for resolution of its dispute with the County and the Sheriff. Those proceedings did not resolve the dispute because the County and the Sheriff continued to insist that the only solution was for ACSC to make "operational changes" in response to the "inadequate State funding."

## IV. LITIGATION

In October 2019, ACSC filed a petition for a writ of mandate and a complaint for declaratory relief under section 69926. The mandate petition alleged that under the 2012 Act and the 2015 MOU the Sheriff and the County had a duty "to provide and pay for Baseline Services at the 129 daily FTE minimum staffing level" even if the State's funding did not cover the cost of doing so until the parties entered into a new MOU. The declaratory relief cause of action sought a declaration of ACSC's rights under the 2012 Act and the 2015 MOU. The County and the Sheriff filed an answer generally denying the allegations and raising numerous affirmative defenses, including impracticability of performance and failure of consideration. They contended that exhibit C-3 of the MOU unambiguously permitted the Sheriff to "match staffing to the funding provided by the State."

After a May 2020 hearing, the trial court found that there was nothing in exhibit C-3 to suggest that the parties intended for the Sheriff to be obligated to provide a minimum of 129 FTEs if the funding provided by the State was not sufficient to support that level of court security services. It rejected ACSC's argument that exhibit C-3 was not a "[d]eployment [s]chedule." The trial court found it unnecessary to consider any

10

extrinsic evidence or the County's affirmative defenses.  The court denied ACSC's writ petition and entered judgment for the County and the Sheriff.  ACSC timely filed a notice of appeal.[6]

## V.    STANDARD OF REVIEW

This case presents issues of both statutory construction and contract interpretation. " ' "Statutory construction is a question of law which requires the exercise of our independent judgment." [Citation.]' [Citation.] 'We apply well-settled principles of statutory construction.  Our task is to discern the Legislature's intent.  The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.  On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction.  In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' [Citation.]  ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . "[A] construction making some words surplusage is to be avoided." [Citation.]  "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230.)" (*Department of*

---

[6] Due to special statutorily mandated procedures, this action was heard by a Second District Court of Appeal justice acting as the trial court, and the appeal was assigned to this court even though the action was brought and adjudicated in Alameda County.  (§ 69926, subd. (e)(2), (e)(5).)

11

*Corrections & Rehabilitation v. State Personnel Bd.* (2014) 227 Cal.App.4th 1250, 1256 (*Department of Corrections*).)

Because the trial court did not consider any extrinsic evidence in reaching its decision, we also review any contract interpretation issues independently.[7] (*Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 256.) "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.) Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822.)

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly,

---

[7] In contrast, "when . . . ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact" (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395), to which we would apply substantial evidence review (*Tin Tin Corp. v. Pacific Rim Park, LLC* (2009) 170 Cal.App.4th 1220, 1225). The trial court did not consider any extrinsic evidence, and we do not find it necessary to do so either.

'[a]n appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' " (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

## VI. DISCUSSION

ACSC contends that the Sheriff and the County remain bound to provide the level of court security services set forth in exhibit C-1 because exhibit C-3 was not a "Baseline Services Deployment Schedule." ACSC premises this argument on the fact that exhibit C-3, unlike exhibit C-1, does not contain "a mutually agreed upon list" of the court security services that the Sheriff is obligated to provide to ACSC, identifying "the personnel, places, and tasks to perform specified security services at court facilities . . . ." ACSC argues that it is therefore exhibit C-1 that governs the level of court security services that the Sheriff is obligated to provide after the MOU expired and the parties failed to agree on a new MOU.

The Sheriff and the County, on the other hand, contend that exhibit C-3, exhibit B, and section 4(A)(1) of the 2015 MOU unambiguously limit the Sheriff's obligation to provide court security services to those that can be paid for with the funds provided by the State.

At the outset, we reject the claims by the County and the Sheriff that exhibit B and section 4(A)(1) of the 2015 MOU limit the Sheriff's obligation to provide court security services to those funded by the State. Section 4(A)(1) of the 2015 MOU provides that "[t]he funding for the Baseline Services will be provided directly by the State of California pursuant to Section 30025." Section 30025 does not restrict baseline services to those funded by the State. Instead, that statute provides that the funds provided by the State for court security "shall be used exclusively to fund trial court security provided by county sheriffs" and that the County may not use these funds for any other purposes.

13

(§ 30025, subd. (f)(10).) This is a restriction on the County's use of these funds, not a restriction on ACSC's entitlement to court security services.

Exhibit B, which governs "reimbursement" for "baseline services," states: "[T]he Sheriff's Office shall be reimbursed for all Baseline Services performed by the Sheriff . . . ." This language pertains to *the **County's** obligation* to "transfer [funds from the] County['s] account to the Sheriff's account . . . to pay for Baseline Services." Exhibit B does not limit the court security services provided to ACSC by the Sheriff; it simply requires the County to reimburse the Sheriff for the cost of those services.

We proceed to the main dispute between the parties: is it exhibit C-3 or exhibit C-1 that governs the court security services that must be provided to ACSC after the expiration of the 2015 MOU? The parties' arguments below and in their original appellate briefs addressed this issue as solely one of contract interpretation. As we perceived there to be an underlying issue of statutory construction, we requested supplemental briefing addressing whether the provisions of exhibit C-3 comply with certain provisions of the 2012 Act. This is the critical issue in our view because only a court security MOU "consistent with" the requirement that it "specif[y] an *agreed-upon level* of court security services" will "remain in effect . . . until the parties enter into a new [MOU]." (§ 69926, subds. (b), (f), italics added.)

The County and the Sheriff urge this court to refrain from "construing the statute" and determining the meaning of "the statutory term 'agreed-upon level' " because they did not brief this issue below, the trial court did not rule on it, and a construction of the statute might affect the interpretation of MOUs in other counties. None of these arguments is persuasive. The meaning of the statute is a question of law that we decide de novo, and we have requested and obtained briefing from the parties on this dispositive issue. Hence, the absence of briefing on this issue below or consideration of it by the trial court is irrelevant. The fact that our construction of the statute may assist in construing MOUs in other counties is all the more reason for us to decide this important

14

issue of statutory construction, not a reason to avoid it. Consequently, we reject the argument that we should ignore this dispositive issue.

This is not an ordinary issue of contract interpretation. Court security MOUs are not ordinary contracts because the parties are statutorily required to enter into them and the nature of such MOUs is statutorily prescribed. In addition, a court's ability to meaningfully negotiate the provisions of a court security MOU is deeply hampered by the court's lack of significant bargaining power. This is true because the court lacks any authority to provide funding for these services, despite the fact that it is required to obtain them from the Sheriff. Nor does the court have any direct influence over the level of funding for these services. Consequently, only strict compliance with the statutory scheme can ensure that courts are able to achieve MOUs that provide them with an "agreed-upon level" of court security that is adequate to support their needs and that they can depend on in planning their future operations.

Two provisions of section 69926 are critical to resolving this dispute. The first one requires that a court security MOU "specify[] *an agreed-upon level* of court security services . . . ." (§ 69926, subd. (b), italics added.) The second one provides that "[t]he terms of a memorandum of understanding shall remain in effect, *to the extent consistent with this article*, and the sheriff shall continue to provide court security as required by this article, until the parties enter into a new memorandum of understanding." (§ 69926, subd. (f), italics added.) Thus, section 69926 requires that a court security MOU "specify[] an agreed-upon level of court security services" in order to "remain in effect" after its expiration and until the parties agree on a new MOU.

When we apply these statutory provisions to the question of whether it is the provisions of exhibit C-1 or those of exhibit C-3 that "remain in effect" after the expiration of the 2015 MOU, the resolution of the parties' dispute is fairly straighforward. Exhibit C-3 does not identify any "*agreed-upon level* of court security services" because it allows the Sheriff to unilaterally reduce services to whatever amount

15

can be supported by the funding provided by the State. Exhibit C-1, in contrast, expressly identifies a minimum level of court security services that is quantified as 129 FTEs.

The County and the Sheriff resist this straighforward analysis. They contend that it does not matter whether exhibit C-3 specifies an "agreed-upon level of court security services" so long as the entire MOU as a whole does so. They alternatively maintain that exhibit C-3 *does* specify an "agreed-upon level of court security services" because the level may be *calculated* from the amount of funding provided by the State.

These arguments are unpersuasive. Under section 69926, it is plain that it is the provisions that would *remain in effect* that must satisfy the statutory requirement that they specify an *agreed-upon level* of court security services. The existence of provisions in exhibit C-1 specifying an agreed-upon level cannot support a finding that exhibit C-3's provisions, which do not do so, remain in effect. We find no merit in the argument by the County and the Sheriff that exhibit C-3 satisifes the statute by providing a means of calculating the amount of services. It is undisputed that the amount of funding provided by the State for court security services can be determined only retrospectively, which necessarily precludes the provisions of exhibit C-3 from prospectively providing for any *agreed-upon level* of court security.[8] A level of court security services that is being constantly adjusted by the Sheriff to match the funding provided by the State is antithetical to the statutory requirement that the MOU "specif[y] an agreed-upon level of court security services."

The Sheriff and the County contend that "an agreed-upon level" does not mandate anything *quantifiable* but merely refers to any agreement between the parties. Because

---

[8] The County produced evidence that the State did not inform the County in advance of the amount it would be depositing into the trial court security account. Instead, the State deposited money each month, and the County only knew how much had been deposited in a fiscal year after the year ended.

16

they do not suggest any alternative explanation for the Legislature's inclusion of the word "level" in its description of the required specification, their construction of the statutory language would render the word "level" surplusage, which would defy the rules of statutory construction. (*Department of Corrections*, *supra*, 227 Cal.App.4th at p. 1256.)

We also note that the statutory construction that is now proposed by the Sheriff and the County is inconsistent with express language in the 2015 MOU to which they agreed and which we must presume conveyed the parties' contemporaneous understanding of the statutory requirements. The MOU expressly stated that it was specifying "*the minimum staffing necessary* for adequate court security . . . ." (Italics added.) The "minimum staffing necessary" cannot be identified without some type of quantification, and this language is plainly inconsistent with an indeterminate amount of court security services that depends solely on funding availability. The MOU also provided that court security services "shall not *increase* beyond the levels" specified in the MOU. (Italics added.) A determination of whether services have *increased* beyond a specified "level" cannot be made if "level" is not quantifiable. The 2015 MOU itself is inconsistent with the construction promoted by the Sheriff and the County.

We reject the essentially meaningless construction that the County and the Sheriff seek to place on the statutory requirement that an MOU specify an "agreed-upon level" of court security services. The 2015 MOU itself implicitly acknowledged that exhibit C-3 did not specify the "level" of court security services. "*The scope and level of Baseline Service*[*s*] . . . for Fiscal Year 2014-2015 and 2015-2016 . . . are specified in this Exhibit A, Exhibit C-1 . . . and Exhibit C-2 . . . . *The preliminary Baseline Service* [*sic*] for Fiscal Year 2016-2017 is discussed in Exhibit C-3." (Italics added.) Exhibit C-1 was described as identifying the "scope and level" of services, while exhibit C-3, tellingly, was not so identified. Furthermore, exhibit C-3's use of the word "level" reflected that it was a quantifiable measure because it identified the "preliminary agreed-upon staffing

17

*level*" for ECHOJ as 37 positions.  (Italics added.)  Accordingly, we reject the construction of section 69926 that the County and the Sheriff urge upon us.

Public policy also supports our interpretation of the statutory scheme because any other interpretation would place ACSC in an untenable position.  The Legislature's long journey through various means of funding court security has always been aimed at ensuring that courts have adequate and dependable court security services.  Nothing in the legislative history suggests that the Legislature wished courts to be at the mercy of those counties that allowed the cost of court security services to exceed the funding provided by the State and that now deny any responsibility for these cost overruns.  Instead, the statutory framework has always required counties to share some responsibility for their own actions, even where those actions have resulted in the cost of court security services exceeding the funding provided by the State.  After all, neither the court nor the State has any power to control these costs.

The County and the Sheriff also argue that even if exhibit C-3 is not statutorily compliant it cannot be severed from the remainder of the 2015 MOU and so no provisions of the 2015 MOU remain in force.  Not so.  The MOU expressly provides: "This MOU is subject to all applicable laws, statutes, rules and regulations.  If *any provision* of this MOU is found by any court or other legal authority, or is agreed upon in writing by Court and Sheriff to be *in conflict with any* law, *statute*, rule or regulation, *the conflicting provision shall be null and void.  The remainder of this MOU shall continue in full force and effect*."  The provisions of exhibit C-3 that permit the Sheriff to unilaterally reduce court security services are "in conflict" with section 69926.  Thus, under the explicit terms of the 2015 MOU, exhibit C-3 "shall be null and void," and the remainder of the 2015 MOU remains "in full force and effect."  As the only provisions in the 2015 MOU that set an "agreed-upon level" of court security services are those in exhibit C-1, it is the provisions of exhibit C-1 that must remain in effect until the parties agree on a new MOU.

18

We perceive nothing unfair or unjust in our resolution of this dispute. The County is free to take its complaints to the Legislature, but it is not free to deprive ACSC of the minimum level of court security services that the County and the Sheriff have acknowledged it needs. Accordingly, ACSC was entitled to prevail on its declaratory relief cause of action.

That does not necessarily mean that ACSC is entitled to prevail on its mandate cause of action as the trial court failed to consider the affirmative defenses. ACSC invites *us* to resolve the affirmative defenses in the first instance because, in its view, the facts are undisputed and our decision on the affirmative defenses would produce an expeditious resolution of this dispute. The County and the Sheriff contend that the affirmative defenses are "fact intensive" and should await resolution by the trial court.

We agree with the County and the Sheriff as to the impracticability defense. " ' "A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." [Citation.]' [Citation.] This does not mean that a party can avoid performance simply because it is more costly than anticipated or results in a loss. [Citation.] Impracticability does not require literal impossibility but applies when performance would require excessive and unreasonable expense. [Citation.]" (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1336.)

The County and the Sheriff supported their impracticability affirmative defense with the Sheriff's declaration that compliance with the 129 FTEs standard would require him to reassign 27 employees to court security, but it would take 18 to 24 months to hire and train any new deputies to replace the reassigned deputies. Almost half of his deputies were assigned to the jail, which was necessary due to litigation involving claims that the jail was understaffed. Reassigning other deputies would endanger public safety. "As the elected Sheriff of Alameda County, I balance these competing needs as best I can with the budget that is available to me." The County had reduced the Sheriff's budget for

19

2019-2020 by $4.7 million due to a "funding gap." The County did not know how much court security funding the State would provide in a fiscal year until after the year ended, and the cost of providing court security services rose every year because the Sheriff's personnel received contractually mandated cost-of-living adjustments each year. Increases in funding by the State were far outstripped by increases in personnel costs.

After this matter was heard in May 2020, ACSC informed the trial court that the County had recently allocated funds to the Sheriff to hire hundreds of new employees to provide services at the jail. ACSC argued that this evidence was pertinent to the County's impracticability defense. The County conceded that point, but it asked the court to allow it to submit other evidence relevant to impracticability, including the impact of the COVID-19 crisis and litigation involving the jail.

The evidence presented by the parties below demonstrates that the impracticability defense depends on the resolution of disputed factual issues and cannot be resolved on the record before us without resolving those disputes. That is the role of a trial court, not an appellate court. We must therefore remand this case to the trial court for further proceedings on the impracticability defense.

The failure of consideration defense, on the other hand, does not raise disputed factual issues. "Failure of consideration is the failure to execute a promise, the performance of which has been exchanged for performance by the other party." (*Bliss v. California Co-op. Producers* (1947) 30 Cal.2d 240, 248.) The County and the Sheriff claim that "[i]nsufficient State funding excuses the Sheriff from performance" because "[f]ull reimbursement is an essential term of the parties' arrangement." This argument harkens back to the argument that the County and the Sheriff make on the merits. The agreement requires the County to reimburse the Sheriff, and it requires the County to use the State's funds for court security. The agreement does not require "[f]ull reimbursement," even if the County may have hoped as much. The failure of consideration defense does not involve any disputed facts, as the Sheriff and the County

20

appear to concede.  Accordingly, it is unnecessary for the trial court to consider the failure of consideration defense on remand.

## VII.   DISPOSITION

The judgment is reversed, and the matter is remand with directions to consider the impracticability affirmative defense raised by the County and the Sheriff.  ACSC shall recover its appellate costs.

_____

ELIA, J.

WE CONCUR:


_____

GREENWOOD, P.J.


_____

BAMATTRE-MANOUKIAN, J.


*Alameda County Superior Court v. Alameda County et. al.*
H048342

Trial Court:                              Alameda County Superior Court
                                          Superior Court No.:  RG19041329


Trial Judge:                              Honorable Steven Z. Perren


Counsel for Plaintiff:                    Reed Smith
THE SUPERIOR COURT OF ALAMEDA             Paul D. Fogel
COUNTY                                    Raymond A. Cardozo
                                          Dennis Peter Maio


Counsel for Defendants:                   Keker, Van Nest & Peters
COUNTY OF ALAMEDA et al.                  Khari Jamil Tillery
                                          Travis S. Silva
                                          Deeva V. Shah


*Alameda County Superior Court v. Alameda County et. al.*
H048342